**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------X
                                            :

IN RE FUQI INTERNATIONAL, INC.       :       10 Civ. 2515 (DAB)
SECURITIES LITIGATION           :
                                            :
------------------------------------------------------------------X     ECF Case

This Document Relates To:

      ALL ACTIONS.

---

### LEAD PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND <u>LEAD PLAINTIFF AWARDS</u>

**ABRAHAM, FRUCHTER & TWERSKY, LLP**
One Penn Plaza, Suite 2805
New York, NY 10119
Tel:    212-279-5050
Fax:   212-279-3655

**Lead Counsel for Lead Plaintiff the PR Group**

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION .................................................................................................1

II.    PROCEDURAL HISTORY.................................................................................2

III.   ARGUMENT ......................................................................................................5

     A.    The Legal Standards Governing the Award of Attorneys' Fees.............................5

     B.    The Requested Attorneys' Fee Award is Warranted ................................................7

          1.    The Time and Labor Expended................................................................7

          2.    The Magnitude and Complexities of the Litigation ....................................9

          3.    The Risk of the Litigation Supports the Requested Fee ..........................11

               a.    The Contingent Nature of Lead Counsel's Representation Supports the Requested Fee ......................................................11

               b.    Litigation Risks.................................................................13

               c.    Risk as to Damages.............................................................15

               d.    Risk to Enforcing a Judgment..............................................16

          4.    The Quality of Representation ................................................................17

          5.    The Requested Fee in Relation to the Settlement ......................................18

          6.    Public Policy Considerations Support the Requested Fee ........................19

     C.    A Lodestar Cross-Check Confirms the Reasonableness of the Requested Attorneys' Fee..........................................................................................21

     D.    The Class' Reaction to the Fee Request ................................................22

     E.    The Expenses of Lead Counsel and Additional Counsel Are Reasonable and Were Necessarily Incurred to Achieve the Benefits Obtained for the Class....................................................................................................23

F.      Lead Plaintiffs' Reasonably Incurred Costs and Expenses Should Be
        Reimbursed ..........................................................................................................24

IV.     CONCLUSION..........................................................................................................25

## TABLE OF AUTHORITIES

CASES

*Anixter v. Home-Stake Prod. Co.*,
    77 F.3d 1215 (10th Cir. 1996) ...................................................................... 12

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)...................................................................................... 19

*Bateman Eichler, Hill Richards, Inc.*,
    472 U.S. 299 (1985)...................................................................................... 19

*Boeing Co. v. Van Gemert*,
    444 U.S. 472 (1980)........................................................................................ 5

*Chatelain v. Prudential-Bache Sec.*,
    805 F. Supp. 209 (S.D.N.Y. 1992) ............................................................. 21

*Frank v. Eastman Kodak Co.*,
    228 F.R.D. 174 (W.D.N.Y. 2005).................................................................. 19

*In re Gilat Satellite Networks, Ltd.*,
    No. CV-02-1510 (CPS)(SMG), 2007 U.S. Dist. LEXIS 68964
    (E.D.N.Y. Sept. 18, 2007) ............................................................................24

*Goldberger v. Integrated Res., Inc.*,
    209 F.3d 43 (2d Cir. 2000)................................................................... passim

*Hicks v. Morgan Stanley & Co.*,
    No. 01 Civ. 10071 (RJH), 2005 U.S. Dist. LEXIS 24890
    (S.D.N.Y. Oct. 19, 2005) ............................................................................. 25

*In re Am. Bank Note Holographics, Inc. Sec. Litig.*,
    127 F. Supp. 2d 418 (S.D.N.Y. 2001)..................................................... 7, 11

*In re AOL Time Warner, Inc. Sec. &"ERISA" Litig.*,
    No. MDL 1500, 2006 U.S. Dist. LEXIS 17588 (S.D.N.Y. Apr. 6, 2006)....................... 10

*In re Apollo Group, Inc. Sec. Litig.*,
    No. CV 04-2147-PHX-JAT, 2008 U.S. Dist. LEXIS 61995
    (D. Ariz. Aug. 4, 2008) ................................................................................ 12

*In re Bristol-Myers Squibb Sec. Litig.*,
    361 F. Supp. 2d 229 (S.D.N.Y. 2005)............................................................. 9

*In re Brown Co. Sec. Litig.*,
355 F. Supp. 574 (S.D.N.Y. 1973) ................................................................ 11

*In re China Sunergy Sec. Litig.*,
No. 07 Civ. 7895 (DAB), 2011 U.S. Dist. LEXIS 53007
(S.D.N.Y. May 13, 2011) .......................................................................... 18-19

*In re Cont'l Ill. Sec. Litig.*,
962 F.2d 566 (7th Cir. 1992) ...................................................................... 12

*In re Flag Telecom Holdings Ltd. Sec. Litig.*,
No. 02-CV-3400 (CM)(PED), 2010 U.S. Dist. LEXIS 119702
(S.D.N.Y. Nov. 5, 2010) ........................................................................ 23, 24

*In re Global Crossing Sec. & ERISA Litig.*,
225 F.R.D. 436 (S.D.N.Y. 2004) ............................................................... 6, 11

*In re: Hi-Crush Partners L.P. Sec. Litig.*,
No. 12-Civ-8557 (CM), 2014 U.S. Dist. LEXIS 177175
(S.D.N.Y. Dec. 19, 2014) ............................................................................ 18

*In re Ikon Office Solutions, Inc., Sec. Litig.*,
194 F.R.D. 166 (E.D. Pa. 2000) ............................................................... 10, 22

*In re Immune Response Sec. Litig.*,
497 F. Supp. 2d 1166 (S.D. Cal. 2007) ........................................................ 24

*In re Initial Pub. Offering Sec. Litig.*,
260 F.R.D. 81 (S.D.N. Y. 2009) .................................................................. 10

*In re IPO Sec. Litig.*,
671 F. Supp. 2d 467 (S.D.N.Y. 2009) ......................................................... 19

*In re Ivan F. Boesky Sec. Litig.*,
888 F. Supp. 551 (S.D.N.Y. 1995) .............................................................. 21

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
No. 04 Civ. 8144 (CM), 2009 U.S. Dist. LEXIS 120953 .................................. 6

*In re Med. X-Ray Film Antitrust Litig.*,
No. CV-93-5904, 1998 U.S. Dist. LEXIS 14888 (E.D.N.Y. Aug. 7, 1998) .................... 20

*In re Merrill Lynch Tyco Research Sec. Litig.*,
249 F.R.D. 124 (S.D.N.Y. 2008) ............................................................ 17, 19

*In re Prudential Sec. Ltd. P'ships Litig.*,
985 F. Supp. 410 (S.D.N.Y. 1997) .............................................................. 12

*In re Rite-Aid Corp. Sec. Litig*,
   396 F.3d 294 (3d Cir. 2005)........................................................................... 7, 23

*In re Telik, Inc. Sec. Litig.*,
   576 F. Supp. 2d 570 (S.D.N.Y. 2008).......................................................... 5, 11

*In re Veeco Instruments Secs. Litig.*,
   No. 05 MDL 01695 (CM), 2007 U.S. Dist. LEXIS 8555
   (S.D.N.Y. Nov. 7, 2007) ................................................................................. 25

*In re Warner Commc'ns Sec. Litig.*,
   618 F. Supp. 735 (S.D.N.Y. 1985) ............................................................ 20, 21

*In re WorldCom, Inc. Sec. Litig.*,
   388 F. Supp. 2d 319 (S.D.N.Y. 2005).............................................................. 20

*In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig.*,
   364 F. Supp. 2d 980 (D. Minn. 2005)......................................................... 24, 25

*Lindy Bros. Builders v. Am. Radiator & Standard Sanitary Corp.*,
   540 F.2d 102 (3d Cir. 1976)............................................................................. 21

*Lindy Bros. Builders, Inc. v. Am. Radiator & Standard Sanitary Corp.*,
   487 F.2d 161 (3d Cir. 1973)............................................................................. 21

*Maley v. Del Global Techs. Corp.*,
   186 F. Supp. 2d 358 (S.D.N.Y. 2002)................................................... 7-8, 18, 20

*Mathes v. Roberts*,
   85 F.R.D. 710 (S.D.N.Y. 1980) ......................................................................... 9

*N.Y. State Ass'n for Retarded Children, Inc. v. Carey*,
   711 F.2d 1136 (2d Cir. 1983)........................................................................... 22

*Redwen v. Sino Clean Energy, Inc.*,
   No. 11-3936-PA (SSx), 2013 U.S. Dist. LEXIS 100275
   (C.D. Cal. July 9, 2013) ................................................................................... 15

*Ressler v. Jacobson*,
   149 F.R.D. 651 (M.D. Fla. Dec. 15, 1992) ...................................................... 20

*Robbins v. Koger Props.*,
   116 F.3d 1441 (11th Cir. 1997) ....................................................................... 12

*Spann v. AOL Time Warner, Inc.*,
   No. 02 Civ. 8238 (DLC), 2005 U.S. Dist. LEXIS 10848
   (S.D.N.Y. June 7, 2005).................................................................................... 19

*Stefaniak v. HSBC Bank USA, N.A.*,
    No. 1:05-CV-720 S, 2008 U.S. Dist. LEXIS 53872
    (W.D.N.Y. June 28, 2008) ........................................................................................ 19

*Strougo v. Bassini*,
    258 F. Supp. 2d 254 (S.D.N. Y. 2003)....................................................................... 11

*Taft v. Ackermans*,
    No. 02 Civ. 7951 (PKL), 2007 U.S. Dist. LEXIS 9144
    (S.D.N.Y. Jan. 31, 2007)........................................................................................... 20

*Teachers' Ret. Sys. v. A.C.L.N., Ltd.*,
    No. 01-CV-11814 (MP), 2004 U.S. Dist. LEXIS 8608
    (S.D.N.Y. May 14, 2004)........................................................................................... 12

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).................................................................................................. 19

*Trustees v. Greenough*,
    105 U.S. 527 (1882).................................................................................................... 5

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
    396 F.3d 96 (2d Cir. 2005).......................................................................................... 6

*Zerkle v. Cleveland-Cliffs Iron Co.*,
    52 F.R.D. 151 (S.D.N.Y. 1971) ................................................................................. 9

## STATUTES

15 U.S.C. § 78u-4(a)(4) ................................................................................................... 24

15 U.S.C. § 78u-4(a)(6) ..................................................................................................... 6

15 U.S.C. §78u-4(a)(b) .................................................................................................... 25

## OTHER AUTHORITIES

*Are You Prepared For This Legal Maze? How To Serve Legal Documents, Obtain
    Evidence, And Enforce Judgments In China*,
    72 UMKC L. Rev. 215 (2003) ..................................................................................... 15

*Consumer Protection in Transnational Contexts*,
    58 Am. J. Comp. L. 135 (2010) ................................................................................... 15

*Enforcing and Collecting Money Judgments in China from a U.S. Judgment
    Creditor's Perspective*,
    36 Geo. Wash. Int'l L. Rev. 757 (2004) ...................................................................... 17

*Establishing the Truth on Facts: Has the Chinese Civil Process Achieved this Goal?*,
     13 J. Transnat'l L. & Pol'y 393 (2004) ............................................................ 15

## I.   INTRODUCTION

The Court-appointed Lead Plaintiff, PR Group (the Puerto Rico Government Employees and Judiciary Retirement Systems Administration, Craig B. Laub, J.D. Pisut and Sandra Redfern (collectively "Plaintiffs")), by and through its undersigned counsel, respectfully submits this memorandum of law in support of Plaintiffs' motion for attorneys' fees, reimbursement of expenses, and lead plaintiff reimbursement awards in the above-captioned action (the "Action").

Plaintiffs have successfully achieved a $7.5 million cash settlement (the "Settlement") on behalf of (1) all persons or entities who purchased or otherwise acquired the common stock of Fuqi International, Inc. ("Fuqi" or the "Company") between May 15, 2009, and March 27, 2011, inclusive, and were damaged thereby and (2) a subclass of all those who purchased or otherwise acquired Fuqi common stock pursuant, or traceable, to the Secondary Offering on or about July 22, 2009 and were damaged thereby (collectively, the "Class").[1]  The Settlement represents an excellent result for the Class, especially considering the risk, expense and delay of continued litigation, and is fair, reasonable, and adequate under the governing standards in this Circuit.  It is the result of Lead Counsel's[2] skill, tenacity and effective advocacy, with Plaintiffs' oversight and involvement.[3]

Neither Lead Counsel, nor Plaintiffs' Additional Counsel, have received any payment for their work or reimbursement for expenses incurred in investigating the facts, conducting this litigation and negotiating the Settlement on behalf of the Lead Plaintiff and the Class.  The $7.5

---

[1] Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families, any entity in which any Defendant has or had a legal controlling interest, and the legal representatives, heirs, successors or assigns of any Defendant.

[2] This memorandum incorporates by reference the definitions in the Stipulation of Settlement dated September 8, 2014 (the "Stipulation") for all capitalized terms used but not defined herein.

[3] References to Lead Counsel and the activities performed on behalf of the Class include, in addition to Abraham, Fruchter &Twersky, LLP, Plaintiffs' counsel who represented other members of Lead Plaintiff PR Group (the "Additional Counsel").  Lead Counsel and the Additional Counsel are collectively referred to as "Plaintiffs' Counsel."

million Settlement pending before the Court compares favorably with the relevant benchmarks for comparable litigation.  Similar fee requests of one-third have been approved repeatedly by this Court in settlements of this magnitude.  The amount of attorneys' fees requested by Lead Counsel and Additional Counsel is eminently reasonable in light of the time and labor expended by counsel, the magnitude and complexities of the litigation, the risks faced in the action, the quality of the representation, the requested fee in relation to the settlement, and for the other reasons enumerated in detail below.  To date, Plaintiffs' Counsel has spent a total of 6,579.15 hours, a lodestar value of $3,156,698.75, and expended $254,406.09 in out-of-pocket expenses.  If approved in full, the fee requested will be a negative multiplier of 0.79 of Plaintiffs' Counsel's combined lodestar.  The expenses requested are reasonable in amount and were necessarily incurred for the successful prosecution of the Action and are of the kind  regularly reimbursed by courts within this Circuit.

Copies of the Notice and Proof of Claim Form ("Notice Packet") have been disseminated to 4,771 potential Class Members stating that Lead Counsel would apply for an award of attorneys' fees not to exceed one-third of the $7.5 million Settlement Fund, expenses not to exceed $300,000, including interest incurred on both amounts, and reimbursement awards to each of the Plaintiffs in amounts of either $10,000 or $5,000.  To date, not a single Class Member has filed an objection to these requests.[4]  The favorable response of the Class further supports the reasonableness of the requested fee and expense award and the reimbursement awards to the Plaintiffs.

Accordingly, the Court should grant Plaintiffs' motion for attorneys' fees, reimbursement of expenses, and lead plaintiff awards.

## II.    PROCEDURAL HISTORY

---

[4] The deadline for filing objections is January 29, 2015. Any objections that are received subsequent to this filing will be addressed in Lead Counsel's reply papers to be filed no later than February 12, 2015.

Class action complaints were first filed in March 2010 after Fuqi announced that it would be restating its financial statements for the first three quarters of 2009.[5]  The cases were consolidated in July 2010 with the PR Group appointed as Lead Plaintiff and Abraham, Fruchter & Twersky, LLP appointed as Lead Counsel.  Levit Decl. ¶25.

Although formal discovery was stayed by the PSLRA and the stipulation entered into by the parties, Plaintiffs retained an investigator, who conducted interviews of various people, mostly in the PRC, who were believed to have knowledge of the facts underlying Plaintiffs' claims.  *Id.* at ¶¶26-28.  Many of those people interviewed were former employees of Fuqi during the Class Period and/or who worked in the Company's accounting or finance departments.  *Id.* at 28.

Plaintiffs filed their Consolidated Complaint on February 15, 2011.  *Id.* at ¶29.  In June 2011, the parties engaged in preliminary discussions concerning the possible resolution of the Action.  *Id.* at ¶30.  In connection with those discussions, Fuqi produced approximately 230,000 pages of documents, many of them in Chinese requiring translation.  In addition, Plaintiffs conducted two interviews, one of an outside attorney retained by Fuqi's Audit Committee to investigate the cash transfer issues, and the other of a member of Fuqi's board of directors, who had served on the Audit Committee.  *Id.*  Thereafter, the parties agreed to mediate and had a session scheduled for December 2011, but it was canceled by Defendants.  *Id.*

Fuqi thereafter replaced its counsel and mediation was not scheduled again until December 2013.  *Id.* at ¶31.  The parties attended a mediation session on December 12, 2013 with the Honorable Layn R. Phillips – a former United States District Judge for the Western District of

---

[5] For the statement of facts, Plaintiffs refer the Court to paragraphs 12-24 of the Declaration of Lawrence D. Levit in Support of Plaintiffs' Motion for Final Approval of Settlement, Application for Award of Attorneys' Fees and Expenses and Lead Plaintiff Awards ("Levit Declaration" or "Levit Decl.") filed concurrently with this memorandum.  Also, additional procedural details are set forth in the Levit Decl. ¶¶25-37.

Oklahoma and one of the most experienced mediators in complex securities litigation cases. Prior to the mediation, each of the parties submitted comprehensive mediation statements setting forth the strengths and weaknesses of their case. *Id.* The mediation session, which lasted the entire day and into the evening, included arguments by Plaintiffs' Counsel and by Fuqi's counsel and its insurance carriers regarding the strengths of Plaintiffs' case, including the ability to collect any judgment and the Plaintiffs' damages analysis. *Id.* at ¶¶31, 32. The parties, with the assistance of Judge Phillips, exchanged counter-proposals throughout the day until Judge Phillips suggested a range within which the parties might be able to reach agreement. *Id.* at ¶32. The parties each separately accepted the range suggested by Judge Phillips and subsequently reached agreement at $7.5 million. *Id.*

On November 7, 2014, Plaintiffs filed an unopposed motion for preliminary approval of Settlement. This Court entered an Order Preliminarily Approving Settlement and Providing for Notice of Proposed Settlement on November 21, 2014 (the "Preliminary Order") (Docket Entry 24), preliminarily certifying the Class. The Court also approved the form and content of the Notice, Proof of Claim and Summary Notice.

The Claims Administrator caused a copy of the court-approved Notice and the Proof of Claim, to be mailed by first class mail to all record owners of Fuqi common stock during the Class Period, as well as brokers, banks and financial institutions. *Id.* at ¶36. The Notice informed members of the Class that Lead Counsel will ask the Court for attorneys' fees not to exceed one-third of the Settlement Fund and expenses not to exceed $300,000 to be paid from the Settlement Fund. In addition, the Notice also advised that Plaintiffs Puerto Rico Government Employees and Judiciary Retirement Systems Administration, Craig B. Laub, J.D. Pisut, and Sandra Redfern, for their efforts on behalf of the Class, have incurred expenses and devoted substantial effort directly related to the representation of the Class for which they will seek reimbursement. Specifically, the

4

Notice stated that Puerto Rico Government Employees and Judiciary Retirement Systems Administration will seek an amount not to exceed $10,000, and Craig B. Laub, J.D. Pisut, and Sandra Redfern will seek amounts not to exceed $5,000 each.

Plaintiffs hereby seek an attorneys' fee award of one-third of the Settlement, reimbursement of expenses in the amount of $254,406.09, and lead plaintiff reimbursement awards totaling $25,000. For the reasons set forth below, the Court should grant Plaintiffs' requests for attorneys' fees, reimbursement of expenses, and lead plaintiff reimbursement awards.

## III.    ARGUMENT

### A.    The Legal Standards Governing the Award of Attorneys' Fees

Pursuant to the "equitable" or "common fund" doctrine, established more than a century ago in *Trustees v. Greenough*, 105 U.S. 527, 532-33 (1882), attorneys who create a common fund to be shared by a class are entitled to an award of fees and expenses from that fund as compensation for their work. *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 584-85 (S.D.N.Y. 2008). The Supreme Court has recognized that a lawyer who recovers a common fund for the benefit of persons other than his client is entitled to a reasonable attorney's fee from the fund as a whole. *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). Fees and expenses are paid from the common fund so that all class members contribute equally toward the costs associated with litigation pursued on their behalf. *See Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 47 (2d Cir. 2000) (the common fund doctrine "prevents unjust enrichment of those benefiting from a lawsuit without contributing to its cost").

Courts traditionally have used two methods to calculate reasonable attorneys' fees in common fund cases: the "percentage method" and the "lodestar method." *Goldberger*, 209 F.3d at 47-48. The percentage method is the simpler method of the two and involves awarding counsel a percentage of the recovery as a fee. *Id.* The lodestar method requires the Court to scrutinize the fee

5

petition to ascertain the number of hours reasonably billed, then multiply that figure by an appropriate hourly rate. *Id.*

Although district courts may use the percentage method or the lodestar method when approving attorneys' fees, "[t]he Second Circuit encourages using the lodestar method only as a cross-check for the percentage method." *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, No. 04 Civ. 8144 (CM), 2009 U.S. Dist. LEXIS 120953, at *43 (*citing Goldberger*, 209 F.3d at 50). In expressly approving the percentage method, the Second Circuit reasoned that the lodestar method is difficult to apply and wastes judicial resources. *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005). Indeed, the percentage approach "aligns the class members' and class counsel's interests and moreover 'provides a powerful incentive for the efficient prosecution and early resolution of litigation.'" *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 466 (S.D.N.Y. 2004). "The percentage method continues to be the trend of district courts in this Circuit and has been expressly adopted in the vast majority of circuits." *Marsh & McLennan*, 2009 U.S. Dist. LEXIS 120953, at *43.

Additionally, the Private Securities Litigation Reform Act of 1995 ("PSLRA") – which applies to securities class actions such as this one – states that "[t]otal attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a ***reasonable percentage*** of the amount" recovered for the Class. 15 U.S.C. § 78u-4(a)(6).[6] Courts have concluded that, by drafting the PSLRA in this manner, Congress expressed a preference for the percentage method as opposed to the lodestar method for determining attorneys' fees in securities class actions. *See Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 370 (S.D.N.Y. 2002); *In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 127 F. Supp. 2d 418, 430 (S.D.N.Y. 2001).

---

[6]     Unless otherwise stated, all internal citations and quotations are omitted and emphasis is added.

Consistent with this trend, Lead Counsel and Additional Counsel ask the Court to award attorneys' fees based on a reasonable percentage of the fund.

### B.     The Requested Attorneys' Fee Award is Warranted

Second Circuit jurisprudence has established six factors that a reviewing court should consider in evaluating what constitutes a reasonable fee:

(1) the time and labor expended by counsel;
(2) the magnitude and complexities of the litigation;
(3) the risk of the litigation;
(4) the quality of representation;
(5) the requested fee in relation to the settlement; and
(6) public policy considerations.

*Goldberger*, 209 F.3d at 50. The *Goldberger* factors "need not be applied in a formulaic way" because each case is different "and in certain cases, one factor may outweigh the rest." *In re Rite Aid Corp. Sec. Litig*, 396 F.3d 294, 301 (3d Cir. 2005). "What constitutes a reasonable fee is properly committed to the sound discretion of the district court." *Goldberger*, 209 F.3d at 47. Consideration of these six factors demonstrates that the fee requested by Lead Counsel and Additional Counsel is reasonable.

### 1.     The Time and Labor Expended

A review of the time and effort expended by Plaintiffs' Counsel establishes that the requested fee is justified.  Lead Counsel and Additional Counsel have devoted a significant amount of time to litigating this case.  While Lead Counsel has devoted a significant amount of time and resources to the research, investigation and prosecution of this Action, they have also prosecuted this Action in an efficient and highly effective manner, resulting in an excellent recovery for the Class without the substantial expense, risk and delay of continued litigation.  Indeed, the Settlement was reached at a point where Lead Counsel had committed extensive resources to understanding the facts and challenges posed by the claims and defenses, and the factors that would impact any recovery.

From the inception of this case, Lead Counsel and Additional Counsel have spent over 6,579 hours in prosecuting this case on behalf of the Class for an aggregate lodestar of approximately $3.1 million, and have incurred $254,406.09 in expenses.  As discussed in more detail in the Levit Declaration and the accompanying Memorandum of Law in Support of Motion for Final Approval of Settlement and Plan of Allocation, during the course of the Action, Plaintiffs' Counsel: (a) conducted an extensive investigation, which included implementing and directing a plan to identify, locate and have interviewed potential witnesses (former employees and customers of Fuqi); (b) researched and prepared an initial complaint, a Consolidated Complaint and a First Amended Complaint; (c) consulted with experienced damages and stock market efficiency financial experts, who prepared and provided a damages analysis on estimating aggregate damages and assisted Lead Counsel's preparation for the mediation; (d) negotiated document production from Fuqi; (e) reviewed more than 230,000 pages of documents, including highly technical and complex accounting and other documents, and translated many documents that were in Chinese; (f) consulted with an accounting expert regarding the Company's restatement and its internal control issues; (g) interviewed outside counsel retained by Fuqi's Audit Committee to investigate the cash transfer issue; (h) interviewed a member of Fuqi's Board who was a member of the Audit Committee; (i) participated in a mediation session on December 12, 2013; (j) prepared and submitted to the mediator, prior to the mediation, a detailed mediation statement, which included citations to and submission of documents produced from Fuqi and other materials that Plaintiffs' Counsel believed supported Plaintiffs' positions, as well as an evaluation of the legal principles that Plaintiffs believed applied to their positions; (k) researched the law applicable to enforcing U.S. judgments in China and assessed the possibilities of collecting on any judgment; (l) began selecting and organizing documents applicable to possible deponents and analyzed anticipated testimony from each witness;

(m) consulted with Plaintiffs' damages expert in devising the Plan of Allocation; (n) negotiated and prepared the final settlement documents; and (o) worked and coordinated with the Angeion Group ("Angeion") to assure timely mailing of notices and effective and efficient claims administration.

The effort expended by Lead Counsel and Additional Counsel was extensive and will continue, and their activities in connection with these proceedings demonstrate a vast and energetic commitment. Additional hours and resources will necessarily be expended assisting Class Members with their Proofs of Claim and other inquiries, as well as overseeing the claims administration process. As discussed herein and in the supporting declaration, Lead Counsel and Additional Counsel believe this commitment and these activities were responsible for the superior result achieved here for the Class.

### 2.    The Magnitude and Complexities of the Litigation

Courts have consistently recognized the complexity, expense, and likely duration of litigation as critical factors in evaluating the reasonableness of a settlement, especially where the settlement being evaluated is a securities class action. *See In re Bristol-Myers Squibb Sec. Litig.*, 361 F. Supp. 2d 229, 234 (S.D.N.Y. 2005). It is widely recognized that shareholder actions are notoriously complex and difficult to prove. *See Mathes v. Roberts*, 85 F.R.D. 710, 713-14 (S.D.N.Y. 1980); *Zerkle v. Cleveland-Cliffs Iron Co.*, 52 F.R.D. 151, 159 (S.D.N.Y. 1971). "[S]ecurities actions have become more difficult from a plaintiff's perspective in the wake of the PSLRA." *In re Ikon Office Solutions, Inc., Sec. Litig.*, 194 F.R.D. 166, 194 (E.D. Pa. 2000); *Ssee also In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, No. MDL 1500, 2006 U.S. Dist. LEXIS 17588, at *33 (S.D.N.Y. Apr. 6, 2006) ("[T]he legal requirements for recovery under the securities laws present considerable challenges, particularly with respect to loss causation and the calculation of damages. These challenges are exacerbated . . . where a number of controlling decisions have recently shed new light

on the standard for loss causation.").  This case is no exception.  Plaintiffs advanced numerous complex legal and factual issues under the federal securities laws, each of which would require extensive testimony by both fact and expert witnesses.  "[A] vast amount of additional factual and expert discovery remains to prepare for trials, and motions would be filed raising every possible kind of pre-trial, trial and post-trial issue conceivable." *In re Initial Pub. Offering Sec. Litig.*, 260 F.R.D. 81, 117 (S.D.N.Y. 2009).  Completing discovery, including expert discovery and the likely need to conduct many depositions, including some that likely would have been conducted overseas, would have taken a very large investment of additional time, and would have cost several hundred thousand dollars more, at a minimum.

In addition, as set forth in the Levit Declaration, the expense and length of the Action would have been further exacerbated because Defendants would have undoubtedly filed motions to dismiss and for summary judgment, and likely would have vigorously opposed Plaintiffs' class certification motion.  Briefing and discovery to resolve those motions would have entailed further substantial expenditure of time and effort.  Assuming Plaintiffs survived Defendants' summary judgment motions, and assuming a class was certified, trial preparation would have required many additional hours of work, at great expense.  The trial in this case would be very complicated for jurors, and would be expensive for the Class.  The trial of liability issues alone would have involved substantial attorney and expert time, the introduction of voluminous documentary and deposition evidence, vigorously contested motions, and the considerable expenditures of judicial resources.  The "normal" cost of litigation, including copying, travel, depositions, computer support services, and other necessary expenses, are quite high.  Here, these costs, and the time involved in preparing for trial, would be even greater as several depositions would likely have occurred in China and required translators.  Moreover, "even if a shareholder or class member was willing to assume all the risks of

10

pursuing the actions through further litigation . . . the passage of time would introduce yet more risks . . .and would, in light of the time value of money, make future recoveries less valuable than this current recovery." *Strougo v. Bassini,* 258 F. Supp. 2d 254, 261 (S.D.N.Y. 2003).

In addition, this Action was vigorously contested, and Defendants were represented by very experienced and qualified attorneys.  *See In re Brown Co. Sec. Litig.*, 355 F. Supp. 574, 592-93 (S.D.N.Y. 1973) (standing of opposing counsel underscores complexity of litigation and challenges faced by class counsel).  Accordingly, the magnitude and complexity of this securities class action supports the conclusion that the requested fee is reasonable and fair.

### 3.    The Risk of the Litigation Supports the Requested Fee

#### a.    The Contingent Nature of Lead Counsel's Representation Supports the Requested Fee

The Second Circuit "has identified the risk of success as perhaps the foremost factor to be considered in determining" reasonable attorneys' fees.  *In re Global Crossing*, 225 F.R.D. at 467; *see also In re Telik*, 576 F. Supp. 2d at 592 ("Courts have repeatedly recognized 'that the risk of the litigation' is a pivotal factor in assessing the appropriate attorneys' fees to award to plaintiffs' counsel in class actions.").  Courts in this Circuit have long recognized that the risk associated with a case bears heavily upon the determination of an appropriate fee award.  *See In re Am. Bank Note*, 127 F. Supp. 2d at 432-33 ("[It is] appropriate to take this [contingent fee] risk into account in determining the appropriate fee to award.").

"Little about litigation is risk-free, and class actions confront even more substantial risks than other forms of litigation."  *Teachers' Ret. Sys. v. A.C.L.N., Ltd*., No. 01-CV-11814 (MP), 2004 U.S. Dist. LEXIS 8608, at *11 (S.D.N.Y. May 14, 2004); *In re Prudential Sec. Ltd. P'ships Litig*., 985 F. Supp. 410, 417 (S.D.N.Y. 1997) ("Numerous courts have recognized that the attorney's contingent fee risk is an important factor in determining the fee award.").  This risk encompasses not just the

risk of no payment, but also the risk of underpayment.  *See In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566,

569-70 (7th Cir. 1992) (reversing district court's fee award where court failed to account for, among

other things, risk of underpayment to counsel).

The reasonableness of the requested fee is also supported by an evaluation of the risks

undertaken by Lead Counsel in prosecuting this class action.  Lead Counsel undertook this Action on

a wholly contingent-fee basis, investing a substantial amount of time and money to prosecute this

Action without a guarantee of compensation or even the recovery of out-of-pocket expenses.  Unlike

counsel for Defendants, who are paid substantial hourly rates and reimbursed for their expenses on a

regular basis, Lead Counsel have not been compensated for any time or expenses since this case

began, and would have received no compensation or even reimbursement of expenses had this case

not been successful.[7]

From the outset, Lead Counsel understood that they were embarking on a complex,

expensive and lengthy litigation with no guarantee of ever being compensated for the enormous

investment of time and money the case would require.  In undertaking that responsibility, Lead

Counsel were obligated to assure that sufficient attorney and para-professional resources were

dedicated to the prosecution of the Action and that funds were available to compensate staff and to

pay for the considerable out-of-pocket costs which a case such as this entails.  Levit Decl. ¶¶69, 73,

---

[7] The risk of no recovery in complex cases of this type is real, and is heightened when lead counsel press to achieve the very best result for those they represent.  There are numerous class actions in which lead counsel expended thousands of hours and yet received no remuneration despite their diligence and expertise.  *See, e.g., In re Apollo Group, Inc. Sec. Litig.*, No. CV 04-2147-PHX-JAT, 2008 U.S. Dist. LEXIS 61995 (D. Ariz. Aug. 4, 2008) (on a motion for judgment as a matter of law, court overturned a jury verdict of $277 million in favor of shareholders based on insufficient evidence presented at trial to establish loss causation); *In re JDS Uniphase Corp. Sec. Litig.*, No. C-02-1486 CW, Verdict Question Form (N.D. Cal. Nov. 27, 2007) (jury verdict for defendants); *Robbins v. Koger Props.*, 116 F.3d 1441 (11th Cir. 1997) (jury verdict of $81 million for plaintiffs against an accounting firm reversed on appeal on loss causation grounds and judgment entered for defendant); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (Tenth Circuit overturned securities fraud class action jury verdict for plaintiffs in case filed in 1973 and tried in 1988 on basis of 1994 Supreme Court opinion).

79, 80.  Because of the nature of a contingent practice where cases are predominantly complex lasting several years, not only do contingent litigation firms have to pay regular overhead, but they also must advance the expenses of the litigation.  Under these circumstances, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis.  *Id.*

In addition to advancing litigation expenses over the past almost five years and paying overhead, Lead Counsel faced the possibility that they would receive no attorneys' fees.  It is wrong to presume that a law firm handling complex contingent litigation always wins.  Tens of thousands of hours have been expended in losing efforts.  The factor labeled by the courts as "the risks of litigation" is not an empty phrase.  There are numerous cases where plaintiff's counsel in contingent cases, such as this, after the expenditure of thousands of hours, have received no compensation.  *See* Levit Decl. ¶¶71-75.  It is only because defendants and their counsel know that the leading members of the plaintiff's securities bar are prepared to, and will, force a resolution on the merits and go to trial, or pursue appeals if necessary, that meaningful settlements in actions such as this can occur.

Losses in contingent fee litigations, especially those brought under the PSLRA, are exceedingly expensive.  As a result, the fees that are awarded in successful litigations are used to cover enormous overhead expenses incurred during the course of the litigation and are taxed by federal, state and local authorities.

### b.    Litigation Risks

As this case amply demonstrates, securities class actions present hurdles to proving liability that are difficult for plaintiffs to meet.  While Plaintiffs believe that their claims would be borne out by the evidence, they also recognize that they face hurdles to proving liability.  At every stage of the litigation, Defendants would have articulated defenses to Lead Plaintiffs' allegations.  As set forth in the Levit Declaration and in the Memorandum in Support of Settlement approval, Defendants

countered the existence of scienter and convincingly presented their defenses during settlement discussions.  *Id.* at ¶¶42-52, 63-64.  For example, among other things, Defendants would have argued that Plaintiffs would have been unable to prove that they made any material misstatements in the Secondary Offering.  Because Fuqi had not yet restated its financials, the amount of the restatement was not known and its first quarter of 2009 numbers may not have been greatly impacted.  Moreover, Defendants would have maintained that the decline in Fuqi's stock price and any losses incurred by shareholders were caused by other factors, and were not caused by any alleged misstatements in, or omissions from, the Registration Statement.  Further, Defendants would contend that if damages were not eliminated, they were severely limited.

Regarding the Exchange Act claims, Defendants were adamant that Plaintiffs would be unable to prove that Defendants had actual knowledge that the financials would need to be restated. Moreover, Defendants consistently contended that they did not act with scienter and therefore  the Exchange Act claims could not succeed.

Defendants also argued that they informed investors about the Company's internal control issues.  Defendants would never concede their liability and would press these defenses in motions to dismiss and for summary judgment, and ultimately, at trial.

Another factor introducing substantial risk into the case is the difficulty of acquiring evidence, given that many of the key witnesses and documents are located in China.  *See, e.g., Redwen v. Sino Clean Energy, Inc.*, No. 11-3936-PA (SSx), 2013 U.S. Dist. LEXIS 100275, at *20 (C.D. Cal. July 9, 2013) ("Lead Plaintiff faced extraordinary discovery costs because all of the Defendants are in the People's Republic of China, and most of the documents are in Chinese.").  Indeed, it can be difficult (and sometimes impossible) to obtain evidence from China because of the very different regulatory regime governing access to documents and witnesses.  For example,

14

"Chinese authorities do not recognize the authority or ability of foreign persons to take voluntary deposition of willing witnesses even before a U.S. consular officer." Fang Shen, *Are You Prepared For This Legal Maze? How To Serve Legal Documents, Obtain Evidence, And Enforce Judgments In China*, 72 UMKC L. Rev. 215, 227 (2003); *see also* Jacques Delisle and Elizabeth Trujillo, *Consumer Protection in Transnational Contexts*, 58 Am. J. Comp. L. 135, 161 (2010) ("Discovery in China for litigation in the United States faces formidable barriers[.]"); Zhong Jianhua and Yu Guanghua, *Establishing the Truth on Facts: Has the Chinese Civil Process Achieved this Goal*?, 13 J. Transnat'l L. & Pol'y 393, 409 (2004) ("Strictly speaking, there is no system comparable to discovery in China."). This factor would also likely impact Lead Plaintiff's ability to secure the appearance of witnesses at trial and was another risk of the litigation.

### c.      Risk as to Damages

Whether Lead Plaintiffs could prove their estimate of damage was also unsettled. Joint Decl. ¶¶47, 50-52. Defendants strenuously disagreed with Lead Plaintiffs' damage estimates, claiming that Fuqi's stock price decline when it announced its restatement was attributable to its earnings announcement, which did not meet expectations. They also argued that the cash transfer disclosure did not result in any significant damages because Fuqi's stock price had already declined substantially. In order for the Class to recover damages at the level estimated by Lead Plaintiffs' expert, Lead Plaintiffs would need to prevail on each and every one of the claims alleged, and for the entire Class. In addition, the damage assessments of the parties' trial experts would be sure to vary substantially, and trial would become a "battle of experts." The outcome of such battles is never predictable, and there existed the very real possibility that a jury could be swayed by experts for the Defendants to minimize the Class' losses or to show that the losses were attributable to factors other than the alleged misstatements and omissions. Thus, even if Lead Plaintiffs prevailed as to liability

at trial, the judgment obtained could well have been only a fraction of the damages claimed.  Despite these risks, Plaintiffs' Counsel obtained a substantial settlement.

### d.        Risk to Enforcing a Judgment

In addition to the above risks, Defendants made a compelling argument during mediation that even if Plaintiffs were to prevail at trial, they would be unable to collect any judgment from a U.S. court against a Chinese company in China.  Defendants claimed that because Fuqi had no assets outside of China, and because four of its officers or directors were located in China, Plaintiffs would be forced to attempt to enforce any judgment by going to the courts in China.  While Plaintiffs dispute Defendants' contentions about the expected futility of attempting an enforcement action in China, it would still be a long, difficult process without any guarantee of success.  Also, by the time Plaintiffs were able to convince the Chinese courts to enforce a judgment against Fuqi, it might no longer have sufficient assets to satisfy any judgment and/or it might no longer be in business.

Attempting to enforce any judgment in China would have been difficult, if not impossible.  *See, e.g.*, Donald C. Clarke, *The Enforcement of United States Court Judgments in China: A Research Note* (May 27, 2004) (unpublished research paper, George Washington Univ. Law Sch. (*available at* http://ssrn.com/abstract=943922)) (the question of whether a U.S. judgment can be enforced in China "can be answered with a fair degree of confidence both as to formal law and as to actual practice: almost certainly no, at least where a defendant is present and objecting."); Arthur Anyuan Yuan, *Enforcing and Collecting Money Judgments in China from a U.S. Judgment Creditor's Perspective*, 36 Geo. Wash. Int'l L. Rev. 757, 758 (2004) ("The enforcement of foreign judgments in China has been notoriously difficult in recent years.").

Moreover, while Lead Plaintiffs could attempt to recover against the Individual Defendants who were located in the U.S., those Defendants would argue that they performed due diligence and

did not act with scienter, and, in any event, they did not appear to have any significant assets. Although some insurance would be available as to any judgment against the Individual Defendants, the amount likely would be substantially reduced if the case went to trial.  Also, one of the insurance carriers was a Chinese entity and the same problems with collection would exist as to it as exist as to Fuqi.  As to recovering against the Underwriters, the standard of liability as to them is more difficult to prove than as to Fuqi as the issuer of the securities.  The Underwriters would argue that they adequately performed due diligence and thus had no liability, which appeared to be a difficult argument for the Plaintiffs to overcome.  In any event, these circumstances posed an additional risk.

Plaintiffs, therefore, faced significant hurdles both in establishing liability and damages and in collecting upon any judgment in the action.  Thus, these risks support the award of attorneys' fees.

### 4.      The Quality of Representation

The fourth *Goldberger* factor is the "quality of representation" delivered in the litigation. *Goldberger*, 209 F.3d at 50.  To evaluate the "quality of representation," courts in the Second Circuit "review the recovery obtained and the backgrounds of the lawyers involved in the lawsuit." *In re Merrill Lynch Tyco Research Sec. Litig.*, 249 F.R.D. 124, 141 (S.D.N.Y. 2008).

Lead Counsel and Additional Counsel have a long history of being actively engaged in complex federal civil litigation, particularly the litigation of securities class actions.  Such experience in the field allowed Lead Counsel and Additional Counsel to identify the complex issues involved in this case and to formulate strategies to effectively prosecute them.  It took a great deal of skill to achieve a settlement at this level in this particular case.  The quality and vigor of opposing counsel is also significant in considering the quality of services rendered by plaintiffs' counsel, as measured by the result achieved.  *Maley*, 186 F. Supp. 2d at 373. Defendants here were represented by very skilled counsel with reputations for vigorous advocacy in the defense of complex civil cases.

Consequently, Defendants, through their counsel, were prepared to zealously fight Lead Plaintiffs' claims at every stage of the proceedings, and were fully prepared to litigate this case through trial and appeals.   This Settlement represents a highly favorable result for the Class, one that is attributable to the diligence, determination, hard work and reputation of Lead Plaintiffs' Counsel, who developed, litigated and successfully negotiated the settlement of this Action, an immediate cash recovery in a very difficult case, without the risk of further litigation.   Accordingly, the quality of the representation of the Class – as measured by the results achieved, counsel's standing and prior experience, and the quality of the opposition – all support the reasonableness of the fee request.

### 5.    The Requested Fee in Relation to the Settlement

The fee requested in this case – one-third of the proposed Settlement – is reasonable and falls in line with fees awarded in comparable actions in this Circuit. *See, e.g., Maley*, 186 F. Supp. 2d at 374 (awarding 33-1/3% of settlement fund, which was within the range in this Circuit) ; *see also In re: Hi-Crush Partners L.P. Sec. Litig.*, No. 12-Civ-8557 (CM), 2014 U.S. Dist. LEXIS 177175, at *33-34, 46 (S.D.N.Y. Dec. 19, 2014) ("the 33 1/3% fee requested by Lead Counsel in this Action is consistent with percentage fees awarded in this Circuit and nationwide"); *In re China Sunergy Sec. Litig.,* No. 07 Civ. 7895 (DAB), 2011 U.S. Dist. LEXIS 53007, at *18 (S.D.N.Y. May 13, 2011) (33 1/3% of $1.05 million fund was reasonable); *In re IPO Sec. Litig.,* 671 F. Supp. 2d 467, 516 (S.D.N.Y. 2009) (33 1/3% of $586 million fund was awarded);  *Stefaniak v. HSBC Bank USA, N.A.*, No. 1:05-CV-720 S, 2008 U.S. Dist. LEXIS 53872, at *10 (W.D.N.Y. June 28, 2008) (awarding 33% of $2.9 million settlement, finding it "typical in class action settlements in the Second Circuit"); *In re Van Der Moolen Holding N.V. Sec. Litig.*, No. 1:03-CV-8284 (RWS), slip op. at 2 (S.D.N.Y. Dec. 6, 2006) (awarding 33-1/3% of $8 million fund); *Spann v. AOL Time Warner, Inc.*, No. 02 Civ. 8238 (DLC), 2005 U.S. Dist. LEXIS 10848 (S.D.N.Y. June 7, 2005) (33.3% of a $2.9 million

settlement); *Frank v. Eastman Kodak Co.*, 228 F.R.D. 174, 189-90 (W.D.N.Y. 2005) (awarding 40% of settlement fund, and noting that due to the relatively small settlement fund, the requested fee award was necessary to compensate counsel adequately).  Accordingly, the requested fee of one-third of the Settlement Fund is supported by other cases within this Circuit.

**6.**      **Public Policy Considerations Support the Requested Fee**

Public policy is the sixth factor a court considers in determining the reasonableness of a fee request.  *See Goldberger*, 209 F.3d at 50.  Courts in the Second Circuit have held that "[p]ublic policy concerns favor the award of reasonable attorneys' fees in class action securities litigation." *In re Merrill Lynch*, 249 F.R.D. at 141-42 ("In order to attract well-qualified plaintiffs' counsel who are able to take a case to trial, and who defendants understand are able and willing to do so, it is necessary to provide appropriate financial incentives.").

The federal securities laws are remedial in nature, and, to effectuate their purpose of protecting investors, the courts must encourage private lawsuits.  *See Basic Inc. v. Levinson*, 485 U.S. 224, 230-31 (1988).  The Supreme Court has emphasized that private securities actions such as this provide "'a most effective weapon in the enforcement' of the securities laws and are 'a necessary supplement to [SEC] action.'"  *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310 (1985) (citation omitted); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (noting that the court has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions).  Plaintiffs' counsel in these types of cases are typically retained on a contingent basis, largely due to the huge commitment of time and expense required.  The typical class representative is unlikely to be able to pursue long and protracted litigation at his or her own expense, particularly with the knowledge that others similarly situated will be able to "free ride" on these efforts at no cost

19

or risk to themselves.  Furthermore, the significant expense combined with the high degree of uncertainty of ultimate success means that contingent fees are virtually the only means of recovery in such cases.  Indeed, lawyers that pursue private suits such as this on behalf of investors augment the overburdened SEC by "acting as 'private attorneys general.'"  *Ressler*, 149 F.R.D. at 657.  Thus, "public policy favors the granting of [attorney] fees sufficient to reward counsel for bringing these actions and to encourage them to bring additional such actions." *Id.*[8]

As actionable securities fraud exists and society benefits from strong advocacy on behalf of securities holders, public policy favors the granting of the fee and expense application.  *See In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 359 (S.D.N.Y. 2005) ("In order to attract well-qualified plaintiffs' counsel who are able to take a case to trial, and who defendants understand are able and willing to do so, it is necessary to provide appropriate financial incentives."); *Taft v. Ackermans*, No. 02 Civ. 7951 (PKL), 2007 U.S. Dist. LEXIS 9144, at *33 (S.D.N.Y. Jan. 31, 2007) ("'the class action mechanism and its associated percentage-of-recovery fee award solve the collective action problem otherwise encountered by which it would not be worthwhile for individual investors to take the time and effort to initiate the action'") (citation omitted).

The willingness to assume the risks in this case by Lead Counsel and Additional Counsel resulted in a substantial benefit to the Class.  If this important public policy is to be carried out, the Court should award fees that adequately compensate Lead Counsel and Additional Counsel, taking

---

[8]  *See also Maley*, 186 F. Supp. 2d at 373 ("In considering an award of attorney's fees, the public policy of vigorously enforcing the federal securities laws must be considered."); *In re Med. X-Ray Film Antitrust Litig.*, No. CV-93-5904, 1998 U.S. Dist. LEXIS 14888, at *23 (E.D.N.Y. Aug. 7, 1998) (awarding fee of 33-1/3% because it "furthers the public policy of encouraging private lawsuits"); *Chatelain v. Prudential-Bache Sec.*, 805 F. Supp. 209, 216 (S.D.N.Y. 1992) (determining that "an adequate award furthers the public policy of encouraging private lawsuits in pursuance of the remedial federal securities laws"); *In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735, 750-51 (S.D.N.Y. 1985) (observing that "[f]air awards in cases such as this encourage and support other prosecutions, and thereby forward the cause of securities law enforcement and compliance"), *aff'd*, 798 F.2d 35 (2d Cir. 1986).

into account the enormous risks undertaken by each firm, with a clear view of the economics of the situation. Accordingly, public policy considerations favor the granting of the fee application.

### C.     A Lodestar Cross-Check Confirms the Reasonableness of the Requested Attorneys' Fee

In *Goldberger*, the Second Circuit held that even in cases in which the percentage method is chosen, "documentation of hours" remains "a [useful] 'cross-check' on the reasonableness of the requested percentage." 209 F.3d at 50.

Under the lodestar method, the court must engage in a two-step analysis: first, to determine the lodestar, the court multiplies the number of hours each attorney spent on the case by each attorney's reasonable hourly rate; and second, the court adjusts that lodestar figure (by applying a multiplier) to reflect such factors as the risk and contingent nature of the litigation, the result obtained and the quality of the attorney's work.  *See, e.g.*, *Lindy Bros. Builders, Inc. v. Am. Radiator & Standard Sanitary Corp.*, 487 F.2d 161, 167-69 (3d Cir. 1973), subsequently refined in *Lindy Bros. Builders v. Am. Radiator & Standard Sanitary Corp.*, 540 F.2d 102, 116-18 (3d Cir. 1976) (*en banc*).  "Calculation of the lodestar, however, is simply the beginning of the analysis."  *Warner Commc'ns*, 618 F. Supp. at 747; *In re Ivan F. Boesky Sec. Litig.*, 888 F. Supp. 551, 562 (S.D.N.Y. 1995).  Performing the lodestar cross-check here confirms that the fee requested by Lead Counsel is reasonable and should be approved.

Plaintiffs' Counsel and their para-professionals have spent, in the aggregate, 6579.15 hours in the prosecution of this case.  *See* Declaration of Mitchell M.Z. Twersky, ¶7; Declaration of Timothy MacFall, ¶7; Declaration of and Declaration of Ex Kano S. Sams II, ¶7, submitted herewith.  The resulting lodestar is $, and provides a negative multiplier of approximately 0.79 to equate with the

requested one-third of the Settlement Fund.[9] Thus, if the Court grants the requested fee in full, Lead Counsel still would not recoup the time they invested in this Action.

The lodestar/multiplier is to be used merely as a cross-check on reasonableness. To find otherwise undermines the principles supporting the percentage approach and encourages needless lodestar building litigation. *See also Ikon*, 194 F.R.D. at 196 ("The court will not reduce the requested award simply for the sake of doing so when every other factor ordinarily considered weighs in favor of approving class counsel's request of thirty percent.").

As detailed by the supporting declaration, Plaintiffs' Counsel invested substantial time and effort prosecuting this Action to a successful completion. The requested fee, therefore, is manifestly reasonable, whether calculated as a percentage of the fund or in relation to Plaintiffs' Counsel's lodestar. Thus, this factor also supports the requested award.

## D.      The Class' Reaction to the Fee Request

To date, the Claims Administrator has sent over 4,771 copies of the Notice to members of the Class informing them, *inter alia*, that Lead Counsel intended to apply to the Court for an award of attorneys' fees up to one-third of the Settlement Fund, plus expenses not to exceed $300,000, plus interest on both amounts. The time to object to the fee request expires on January 29, 2015. To date, two weeks before the objection deadline, not a single objection to the fee and expense request has been received. "[S]uch a low level of objection is a 'rare phenomenon.'" *Rite Aid*, 396 F.3d at 305 (citation omitted). The fact that no objections were received is compelling evidence of the fairness of the fee request.

---

[9] The Supreme Court and other courts have held that the use of current rates is proper since such rates compensate for inflation and the loss of use of funds. *See Missouri v. Jenkins*, 491 U.S. 274, 283-84 (1989); *N.Y. State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1153 (2d Cir. 1983) (use of current rates appropriate where services were provided within two or three years of application).

**E.     The Expenses of Lead Counsel and Additional Counsel Are Reasonable and Were Necessarily Incurred to Achieve the Benefits Obtained for the Class**

"It is well accepted that counsel who create a common fund are entitled to the reimbursement of expenses that they advanced to a class." *In re Flag Telecom Holdings Ltd. Sec. Litig.*, Master File No. 02-CV-3400 (CM)(PED), 2010 U.S. Dist. LEXIS 119702, at *86 (S.D.N.Y. Nov. 5, 2010). "Courts in the Second Circuit normally grant expense requests in common fund cases as a matter of course." *In re EVCI*, 2007 U.S. Dist LEXIS 57918, at *57. Plaintiffs' Counsel respectfully request reimbursement of $254,406.09 in expenses incurred while prosecuting this Action. Plaintiffs' Counsel have submitted separate attestations regarding the accuracy of these expenses, which are properly recovered by counsel.

The litigation expenses incurred here were well within the normal range for a complex securities action and reflect the costs necessary to research the complex issues presented. Most of Plaintiffs' Counsel's expenses included costs incurred for professional services rendered by Lead Plaintiff's experts and consultants, investigators and mediation expenses. The remaining expenses are attributable to the costs of copying documents, travel, delivery and messenger services and other incidental expenses incurred in the course of litigation. These expenses were critical to Lead Plaintiffs' success in achieving the proposed Settlement. *See Global Crossing*, 225 F.R.D. at 468 ("The expenses incurred – which include investigative and expert witnesses, filing fees, service of process, travel, legal research and document production and review – are the type for which 'the paying, arms' length market' reimburses attorneys . . . [and] [f]or this reason, they are properly chargeable to the Settlement fund."). Lead Counsel and Additional Counsel have carefully reviewed these expenses and determined that the requested expenses were necessary litigation expenses, reasonably incurred, and reasonably related to the interests of the members of the Class.

Accordingly, the application of  Lead Counsel and Additional Counsel for reimbursement of expenses should be granted.

**F.     Lead Plaintiffs' Reasonably Incurred Costs and Expenses Should Be Reimbursed**

"The PSLRA permits the court to order an award to lead plaintiffs for the services they rendered in a securities class action." *In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig.*, 364 F. Supp. 2d 980, 1000 (D. Minn. 2005) (citing 15 U.S.C. § 78u-4(a)(4)).  With the discretion provided by the PSLRA, courts have routinely availed themselves of the power to grant remuneration to representative plaintiffs reflecting their services undertaken for the benefit of the class.  *See Flag Telecom* 2010 U.S. Dist. LEXIS 119702, at *88-92 (court grants awards to plaintiffs for time and oversight of the litigation on behalf of the class);  *Hicks v. Morgan Stanley & Co.*, No. 01 Civ. 10071 (RJH), 2005 U.S. Dist. LEXIS 24890, at *30 (S.D.N.Y. Oct. 19, 2005) ("Courts in this Circuit routinely award such costs and expenses both to reimburse the named plaintiffs for expenses incurred through their involvement with the action and lost wages, as well as to provide an incentive for such plaintiffs to remain involved in the litigation and to incur such expenses in the first place.") (citations omitted); *see also In re Immune Response Sec. Litig.*, 497 F. Supp. 2d 1166, 1173-74 (S.D. Cal. 2007) (reimbursing plaintiff $40,000 in lost wages);  *In re Veeco Instruments Secs. Litig.*, No. 05 MDL 01695 (CM), 2007 U.S. Dist. LEXIS 8555, at *39 (S.D.N.Y. Nov. 7, 2007) (awarding institutional lead plaintiff $16,089.20 on a $5.5 million settlement for time spent by employees);  *In re Gilat Satellite Networks, Ltd.*, No. CV-02-1510 (CPS)(SMG), 2007 U.S. Dist. LEXIS 68964 (E.D.N.Y. Sept. 18, 2007) , at *62 (awarding $10,000 for time spent by employees); *In re Bradley Pharms., Inc. Secs. Litig.*, No. 05-cv-1219 (PGS)(ES), Order & Final J., ECF No. 127, at 7 (June 23, 2009) ( $10,000 for time spent by two employees).

As detailed in the Plaintiff Declarations submitted herewith, each of the four members of the

Lead Plaintiff PR Group requesting compensation have been fully committed to pursuing the claims of the Class against the Defendants during the almost five years this case has been pending.  In devoting substantial effort and time to this Action on behalf of the Class, they each reviewed filings and communicated with Plaintiffs' Counsel, including during the settlement negotiations.  These are precisely the types of activities found to support reimbursement to representative plaintffs.  *See Xcel Energy,* 364 F. Supp. 2d at 1000 (granting awards to lead plaintiffs where they reviewed pleadings, communicated with counsel, indicated willingness to appear at trial, kept informed of settlement negotiations, and effectuated policies of federal securities laws).  Accordingly, Lead Counsel respectfully request that an award of $10,000 be made to the Puerto Rico Government Employees and Judiciary Retirement Systems Administration and that awards of $5,000 each be made to Craig B. Laub, J.D. Pisut and Sandra Redfern, as reimbursement for their efforts in obtaining the Settlement for, and representing, the Class.

## IV.     CONCLUSION

For the foregoing reasons and the entire record herein, Plaintiffs respectfully request that this Court grant Plaintiffs' motion for an award of attorneys' fees of 33% of the Settlement Fund plus reimbursement of  expenses in the amount of $254,406.09, plus interest on both amounts, as provided for by 15 U.S.C. §78u-4(a)(b), and awards to Lead Plaintiff of $10,000 to the Puerto Rico Government Employees and Judiciary Retirement Systems Administration and of $5,000 each to Craig B. Laub, J.D. Pisut and Sandra Redfern.

Dated: January 15, 2015    Respectfully submitted,

            **ABRAHAM, FRUCHTER & TWERSKY, LLP**

            By: /s/ Mitchell M.Z. Twersky
            Mitchell M.Z. Twersky (MT-6739)
            Lawrence D. Levit (LL-9507)
            One Penn Plaza, Suite 2805
            New York, NY 10119
            Telephone: (212) 279-5050
            Facsimile: (212) 279-3655

            *Lead Counsel for Plaintiffs*

26