**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ─────────────────────────── x | | |
| In re FUQI INTERNATIONAL, INC. | : | 10 Civ. 2515 (DAB) |
| SECURITIES LITIGATION | : | |
| | : | <u>CLASS ACTION</u> |
| ─────────────────────────── | : | |
| | : | |
| This Document Relates To: | : | ECF CASE |
| | : | |
| ALL ACTIONS. | : | |
| | : | |
| ─────────────────────────── x | | |

**AMENDED DECLARATION OF LAWRENCE D. LEVIT**
**IN SUPPORT OF LEAD PLAINTIFF'S AMENDED MOTION FOR FINAL APPROVAL**
**OF SETTLEMENT AND PLAN OF ALLOCATION AND FOR ATTORNEYS' FEES,**
**REIMBURSEMENT OF EXPENSES AND LEAD PLAINTIFF AWARDS**

ABRAHAM, FRUCHTER & TWERSKY, LLP
One Penn Plaza, Suite 2805
New York, NY  10119
Telephone:  212/279-5050
212/279-3655 (fax)

**Lead Counsel for Lead Plaintiff the PR Group**

Lawrence D. Levit declares as follows:

1.      I am a member of the New York Bar admitted to practice before this Court and am of counsel with the firm of Abraham, Fruchter & Twersky, LLP ("AF&T"), the firm which is Lead Counsel for Lead Plaintiff the PR Group in the above-captioned consolidated action (the "Action"). I submit this Declaration in Support of Lead Plaintiff's Amended Motion for Final Approval of the Settlement and Plan of Allocation and For Attorneys' Fees, Reimbursement of Expenses and Lead Plaintiff Awards.  I have personal knowledge of the matters set forth herein based on my active participation in all material aspects of the prosecution and settlement of this litigation.  If called upon, I could and would competently testify that the following facts are true and correct.

2.      Lead Plaintiff the PR Group, composed of the Puerto Rico Government Employees and Judiciary Retirement Systems Administration, Craig B. Laub, J.D. Pisut, and Sandra Redfern have entered into a settlement on behalf of themselves and the other members of the Class with Defendants,[1] which provides a recovery of $7,500,000 in cash to resolve this securities class action against all Defendants (the "Settlement").  The Settlement is contained in the Stipulation of Settlement entered into by all parties dated September 8, 2014 (the "Stipulation") and previously filed with the Court.

3.      This Declaration sets forth the nature of claims asserted, the principal proceedings in this Action, the legal services provided by Lead Counsel or others working at its direction, the settlement negotiations, and also demonstrates why the Settlement and Plan of Allocation are fair and in the best interests of the Class, why the application for attorneys' fees and reimbursement of

---

[1] The Settlement excludes all potential claims against Stonefield Josephson, Inc., the auditor of Fuqi International, Inc. ("Fuqi" or "the Company") during the relevant period.

expenses is reasonable and should be approved by this Court and why the awards to the members of Lead Plaintiff PR Group are reasonable and should be approved by this Court.

## I.        PRELIMINARY STATEMENT

4.        This case was carefully investigated and has been vigorously litigated since its commencement.  Plaintiffs' Counsel reviewed and analyzed more than 230,000 pages of non-public documents produced by Fuqi, many of them in Chinese.[2]  In addition, Plaintiffs' Counsel reviewed Fuqi's publicly filed documents, financial reports, analysts' reports and press releases.  The documents reviewed provided detailed factual information concerning the alleged false and misleading statements relating to Fuqi's financial statements and its internal controls, as well as the cash transfers that were alleged to have been improperly approved by its Chief Executive Officer. Plaintiffs' Counsel also consulted with experts in accounting, loss causation and damages, and thoroughly researched the law pertinent to the claims and defenses asserted.

5.        While the document review undertaken by Plaintiffs' Counsel was by itself large, it was made all the more challenging by the fact that many of the documents were in Chinese and required translation.  Plaintiffs' efforts were also hindered by the fact that Fuqi did not issue a restatement and did not file any substantive financial documents with the U.S. Securities and Exchange Commission (the "SEC") once it announced that a restatement of certain of its financial statements was required.  Moreover, Fuqi contended that even if the litigation resulted in a judgment against it and others, Plaintiffs would never be able to enforce that judgment in the Peoples' Republic of China (the "PRC" or "China") and attempts to collect on any judgment, which they

---

[2] Lead Counsel's work on behalf of the Class was performed with the assistance of other plaintiffs' counsel, who appeared in this Action on behalf of members of Lead Plaintiff PR Group.  AF&T together with other plaintiffs' counsel are referred to herein as Plaintiffs' Counsel.

claimed would last for years, would ultimately be futile.  In the face of these obstacles, the parties engaged in a mediation before retired United States District Court Judge Layn R. Phillips, an experienced mediator who was with the Alternative Dispute Resolution Center at Irell & Manella LLP at the time, where the parties met face-to-face, made comprehensive presentations regarding the claims and defenses thereto, including damages, and negotiated settlement terms.  During the full day session before Judge Phillips, which lasted into the evening, the parties reached an agreement to resolve the Action.

6.      The proposed $7,500,000 Settlement is a notable achievement derived from the substantial efforts of Lead Counsel who zealously litigated this case.  The proposed Settlement is a superb result for the Class, particularly under the circumstances of this litigation, and is eminently fair, reasonable and adequate based on the numerous impediments to recovery, the legal hurdles and risks involved in proving liability and damages as well as the further risk, delay and expense had this case continued through motion practice, including summary judgment, and/or trial against the Defendants.  Moreover, the amount of the proposed recovery for the Class is particularly noteworthy given that Fuqi is located in China and has all of its assets there.  Recoveries in securities class actions against Chinese issuers have generally been significantly lower than securities settlements against U.S. companies.  Lead Plaintiff and Defendants do not agree on the average amount of damages per share that would be recoverable if Plaintiffs were to have prevailed on the claims asserted, nor that Plaintiffs would have prevailed at all.  Indeed, the Defendants continue to assert that the Class suffered little or no damages as a result of the securities law claims that are alleged in the Amended Complaint.  In light of such adamant opposition, a recovery of $7.5 million to be distributed to the Class, derived solely from Lead Counsel's efforts, represents a highly successful result.

7.      The Settlement was negotiated on all sides by experienced counsel with a firm understanding of the strengths and weaknesses of their clients' respective claims and defenses.  The Settlement confers substantial and immediate benefits to the Class while eliminating the risk of little or no recovery against the Defendants.  Lead Counsel respectfully submit that under these circumstances, the Settlement is in the best interests of the Class and should be approved as fair, reasonable and adequate.  The Court should also approve the Plan of Allocation of settlement proceeds and award attorneys' fees in the amount of one-third of the Settlement Fund, plus expenses incurred in the prosecution of this litigation in the amount of $252,602.58, which have been incurred or advanced by Plaintiffs' Counsel in connection with this litigation, plus interest thereon, as a result of Plaintiffs' Counsel's considerable efforts in creating this substantial benefit on behalf of the Class, and as recognition for the risks faced and overcome.

8.      The Class appears to overwhelmingly approve the Settlement.  Pursuant to paragraph 3, page 3 of this Court's Order Preliminarily Approving Settlement and Providing for Notice of Proposed Settlement (the "Preliminary Approval Order"), dated November 21, 2014, Angeion Group ("Angeion") was appointed Claims Administrator to supervise and administer the notice procedure as well as the processing of Claims in connection with the proposed Settlement of this action.  *See* Amended Declaration of Charles E. Ferrara re: (1) Updated Report on Notice of the Settlement Class; (2) Receipt of Exclusion Requests and Objections; and (3) Report on Number of Claims Filed ("Ferrara Decl.") (attached as Exhibit 9 hereto), ¶2.  As Angeion previously informed the Court, as of January 14, 2015, Angeion had delivered 4,771 copies of the Notice and Proof of Claim Form (together, the "Notice") to the United States Postage Service ("USPS") to be mailed by First-Class mail, post pre-paid.  Ferrara Decl., ¶3.  During the process of providing Notice to Class Members, Angeion received requests from brokers and other nominees to: (1) send the Notice to the broker or

nominee for distribution to the broker or nominee's customers with relevant holdings; or (2) send the Notice directly to the broker or nominee's customers with relevant holdings, whose contact information the broker's or nominee provided to Angeion. *Id.* Banks, brokers and other nominees were requested, within 20 days of receipt of the Notice, to either send a copy of the Notice to the beneficial owners or to provide Angeion with a list of beneficial owners who would then be mailed the Notice by Angeion. *Id.* On or about February 12, 2015, Angeion updated the Court and declared that 39,425 Notices had been mailed as a result of requests from brokers and other nominees, to be sent directly, or indirectly through the brokers and other nominees, to potential Class Members. *Id.*, ¶4. Subsequently, on or about March 17, 2015, Angeion mailed an additional 12,437 copies of the Notice by First-Class mail, based on a request received from Scottrade on March 10, 2015. *Id.* Through August 27, 2015, as a result of requests from brokers and other nominees, Angeion sent, in total, 56,938 Notices, directly or indirectly to potential Class Members. *Id.*, ¶5. Settlement Class Members were initially notified that written requests for exclusion from the Settlement Class were to be mailed, postmarked no later than January 29, 2015. *Id.*, ¶9. Angeion has monitored all mail that has been received. *Id.* Angeion received one timely filed request for exclusion from the Settlement Class postmarked no later than January 29, 2015 and two late-filed requests for exclusion (one postmarked February 2, 2015 and the other postmarked March 25, 2015). *Id.* On April 29, 2015, the Court granted Plaintiffs' Counsel's request that the late filed requests for exclusion be accepted. *Id.* Settlement Class Members were also initially notified that objections were to be delivered no later than January 29, 2015. *Id.*, ¶10. As of February 11, 2015, Angeion received one timely objection to the settlement. *Id.* On February 17, 2015, the Court denied this objection. *Id.* No other objections have been received to date. *Id.* In this era of heightened shareholder activism, such a low degree of objection is noteworthy. Angeion has also received 2,256 paper claims and 86 electronic files

containing approximately 3,189 individual claims, for a total of approximately 5,445 claims filed to date. *Id.*, ¶12.

9.      Plaintiffs' Counsel has litigated this case for more than five years on a wholly-contingent basis.  The fee application for one-third of the total recovery is fair, reasonable and adequate under the circumstances of this case and warrants Court approval.  This fee request is well within the range of fees typically awarded in actions of this type and is wholly justified in light of the benefits obtained, the legal time expended (i.e., a lodestar in the amount of $3,156,698.75), the substantial risks undertaken, and the quality, nature and extent of the services rendered, as more fully set forth in Lead Plaintiff's Memorandum of Law in Support of Amended Motion for Attorneys' Fees, Reimbursement of Expenses, and Lead Plaintiff Awards, submitted herewith.  The fee requested would result in a negative multiplier of 0.79 given the time expended in this Action.

10.     In sum, the Settlement is the product of hard-fought litigation and protracted arm's-length negotiation and takes into consideration the risks specific to this case    Lead Counsel respectfully submit that under these circumstances the Settlement is in the best interests of the Class and should be approved as fair, reasonable and adequate.

11.     The following sets forth the principal proceedings in this matter and the major legal services provided by Lead Counsel, the negotiations of the Settlement, the terms of the Settlement, why the Settlement and the Plan of Allocation are fair and in the best interests of the Class, and the reasonableness of Lead Counsels' fee and expense request and the Lead Plaintiff awards.

## II.    STATEMENT OF FACTS

12.    This securities class action was brought against Fuqi, certain of its former officers, its directors during the Class Period, and the Underwriters for the Secondary Offering.[3]  Plaintiffs allege that Defendants committed violations of the Securities Act of 1933 ("Securities Act") and/or the Securities Exchange Act of 1934 ("Exchange Act").  The action is brought pursuant to the Exchange Act on behalf of a class (the "Class") of all persons, other than Defendants and related persons, who purchased or acquired shares of Fuqi common stock from May 15, 2009 to March 27, 2011, inclusive (the "Class Period"), and/or pursuant to the Securities Act on behalf of all persons, other than Defendants and related persons, who purchased Fuqi common stock in the Company's Secondary Offering on or about July 22, 2009.

13.    Fuqi operates through its wholly-owned subsidiary, Fuqi International Holdings, Co., Ltd., a British Virgin Islands corporation, and its wholly-owned subsidiary, Shenzhen Fuqi Jewelry Co., Ltd., established under the laws of the PRC ("SZ Fuqi").  Fuqi traded on the Nasdaq during the Class Period.  Fuqi through SZ Fuqi, is a designer and manufacturer of gold and precious metal jewelry, developing and selling a range of products made from gold, platinum and other precious

---

[3] Defendants are: Fuqi; President, Chief Executive Officer ("CEO"), and Chairman of the Company's Board of Directors ("Board") Yu Kwai Chong ("Chong"); Chief Financial Officer ("CFO") and director Ching Wan Wong ("Wong"); Chief Operating Officer and director Lie Xi Zhuang ("Zhuang"); directors who were members of Fuqi's Audit Committee:  Eileen B. Brody ("Brody"),Victor A. Hollander ("Hollander") and Jeff Haiyong Liu ("Liu"); director Lily Lee Chen ("Chen"); William Blair & Co. ("William Blair"), an underwriter and the Sole Book-Running Manager for Fuqi's July 22, 2009 stock offering ("Secondary Offering"); Oppenheimer & Co. Inc. ("Oppenheimer"), an underwriter and Co-Lead Manager in the Secondary Offering; Cowen and Company, LLC ("Cowen"), an underwriter and Co-Lead Manager in the Secondary Offering. Willliam Blair, Oppenheimer and Cowen are referred to herein as the "Underwriters."  Chong, Wong, Zhuang, Bordy, Hollander, Liu and Chen are referred to as the "Individual Defendants." The positions listed above for the Individual Defendants were their positions during the Class Period. They no longer hold these positions with the Company.

metals. Although Fuqi began by selling its products to wholesale customers, in 2007 the Company began a retail strategy, focusing on diamond and other gemstone jewelry. In August 2008, Fuqi opened and/or acquired 56 retail counters in department stores and seven standalone stores in China (primarily located in Shanghai and Beijing) and started to operate the brand "Temix" store chain that it had acquired for, reportedly, $11.7 million.

14.     In the first quarter of 2009, Fuqi had approximately 70 jewelry retail counters and/or stores in China. Wholesale jewelry accounted for approximately 88% of revenue and the remainder was retail sales. The Company's net revenue and net income doubled from 2007 to 2008. For the year ending December 31, 2007, revenue was $145.6 million, which increased to $367.6 million as of December 31, 2008. Fuqi's net income increased from $13.5 million as of December 31, 2007 to $27.9 million one year later.

15.     On July 22, 2009, Fuqi's Secondary Offering was declared effective by the SEC in which it was to sell 4,855,000 shares of common stock at a price of $21.50 per share, raising more than $104.3 million. The Underwriters exercised their over-allotment and purchased and sold an addition 726,395 shares at $21.50 per share for total proceeds to Fuqi of approximately $112.4 million.

16.     During the first three quarters of 2009, Fuqi reported significant financial growth and increased profitability. For example, the Company boasted increases in gross profits as a percentage of revenues of 5.15%, 6.60%, and 11.8% for the quarters ended March 31, 2009, June 30, 2009, and September 30, 2009, respectively. Likewise, Fuqi reported increases in net income as a percentage of revenues of 0.59%, 1.93%, and 7.80% for the same periods.

17.     Based on the Company's financial performance, various analysts and market commentators repeatedly touted the Company's stock as one of "5 Stocks Approaching Greatness"

and one of "China's Undiscovered Gems."  As a consequence of Fuqi's publicly reported financial success, the price of the Company's common stock rose dramatically during the Class Period.  For example, on May 15, 2009, at the beginning of the Class Period, the Company's common stock closed at $7.61 per share.  During the Class Period, Fuqi's stock closed as high as $31.86 per share.

18.     On November 9, 2009, before the market opened, Fuqi reported its results for the third quarter of 2009.  While Fuqi generally reported results in conformity with estimates, it only met those estimates through an unusually high recognition of high margin original design manufacturing revenue, which had gross margins higher than the Company's historical gross margins for its wholesale business.  Thus, the quality of Fuqi's earnings was questioned.  The Company's announcement resulted in a decline in Fuqi's stock price from $23.33 per share prior to the announcement to a closing price of $19.18 per share on November 9, 2009.

19.     The full extent of the problems at Fuqi would not be disclosed, however, until the end of the Class Period.  Unbeknownst to the investing public, and contrary to the Company's Class Period representations, Fuqi suffered from inadequate internal financial controls that caused the Company to report materially false financial results during the Class Period.  In addition, Fuqi's financial control deficiencies were so pervasive that the Company would ultimately disclose that it had engaged in unauthorized cash transfers of approximately $135 million to unrelated third parties.  As a result, the Company shocked the market when, on March 16, 2010, it announced that it was conducting an internal assessment of its internal controls as of December 31, 2009; that it was unable to timely file its annual report for 2009 with the SEC due to certain accounting errors caused by a material weakness in its internal controls during 2009; and that investors should no longer rely upon the Company's previously issued financial statements for the periods ending March 31, 2009, June 30, 2009, and September 30, 2009.

20.     Since that announcement about its need to restate, Fuqi has not filed any of its financial statements with the SEC or restated previously filed financial statements (and apparently has not filed complete annual reports with Shenzhen Administration of Industry and Commerce ("AIC")).

21.     On the disclosure of the news about the Company's need to restate, Fuqi's share price decreased dramatically.

**Nasdaq Delists Fuqi's Stock**

22.     Subsequently, while Fuqi announced that it was continuing to work on filing its restatements – after it repeatedly failed to make any filings of its financial statements with the SEC – Nasdaq delisted the Company's stock on March 28, 2011.  On July 1, 2013, the SEC revoked the registration of Fuqi's securities pursuant to § 12(j) of the Exchange Act for failure to file periodic reports since the period ended September 30, 2009.

**Fuqi Announces Investigation of Its CEO-Approved Cash Transfers**

23.     On March 28, 2011, Fuqi announced that the Company had made certain cash transfers beginning in September 2009 to three unrelated companies.  The Company further announced that these cash transfers were being investigated by Fuqi's Audit Committee.  The transfers, which were approved by Fuqi's CEO, were allegedly requested by Fuqi's bank.  Fuqi purportedly received no *quid pro quo* for making the transfers.  In total, more than $135 million was transferred by Fuqi to the three companies.  Fuqi did not receive any interest or other explicit financial compensation for making the transfers.  Fuqi claimed that all funds were paid back from the three companies prior to the end of the quarter so that no amount was owed to Fuqi at the end of any quarter.

**The SEC Announces Settlement With Fuqi and Its CEO**

24.     On July 1, 2013, the SEC announced that Fuqi and defendant Chong had agreed to settle false and misleading statement charges under §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, relating to the above-referenced cash transfers, that had been filed by the SEC in the action *Securities and Exchange Commission v. Fuqi International, Inc. and Yu Kwai Chon*g, Case No. 13-cv-995 (RC) (D.D.C.).   Fuqi and Chong consented to the entry of a final judgment that: (i) permanently enjoined them from future violations of the federal securities laws; (ii) ordered Fuqi and Chong to pay civil penalties of $1 million and $150,000, respectively; and (iii) barred Chong from serving as an officer and director for five years.  Final judgments were entered against Fuqi and Chong on August 7, 2013, and a corrected final judgment against Chong on October 3, 2013.

**The Litigation Commences**

25.     During March 2010, an initial complaint was filed against Fuqi and others, alleging violations of the federal securities laws.  Several additional complaints were subsequently filed, alleging similar claims.  On July 26, 2010, the Court consolidated all similar cases, appointed the PR Group as Lead Plaintiff and approved their selection of AF&T as Lead Counsel.  Dkt. No. 47.

26.     The Court initially ordered that a consolidated complaint be filed 30 days from the date of the consolidation order.  The parties, however, agreed that the date of the filing of a consolidated complaint should occur after the restatement was publicly disclosed.  Thus, the Court approved the parties' stipulation that any consolidated complaint would be filed 30 days after Fuqi publicly released its restated financial statements for the first three quarters of 2009 and for the fiscal year ended December 31, 2009.  Dkt. No. 50.

27.     Subsequently, Plaintiffs entered into a tolling agreement with Fuqi's auditors, Stonefield Josephson, Inc. (which has since merged with Marcum LLP) and then determined that a

consolidated complaint, combining all claims and all defendants in one pleading, was needed.  The Court approved the parties' stipulation allowing for the filing of a consolidated complaint, and providing that a response to that complaint by defendants was not required at the time, pending the release by Fuqi of its financial statements for the year ended December 31, 2009 and its restated financials, and a determination as to whether the Plaintiffs would amend their complaint.  Dkt. No. 54.

28.     Although formal discovery was stayed by the PSLRA and the stipulation that Defendants currently did need not to respond to the complaint, Plaintiffs retained investigators, who conducted interviews of various people, mostly in the PRC, who had contact with or a connection to Fuqi.  Many of those people interviewed were former employees of Fuqi during the Class Period and/or who worked in Fuqi's accounting or finance departments.

29.     Plaintiffs filed their Consolidated Complaint on February 15, 2011.  Dkt. No. 55.  All defendants, except for two of the four individual defendants who reside overseas (the "Overseas Defendants"), were served.  On March 9, 2011, the Court rejected Plaintiffs' request to file a motion for alternative service on the Overseas Defendants and, instead ordered that Hague Convention procedures be used to serve them.  Dkt. No. 56.  Plaintiffs' process server then attempted to locate and serve the Overseas Defendants.  Two of the Overseas Defendants were served and two had not yet been served at the time the parties reached agreement.  The Court has approved extensions to serve them.  While they have not had to file a response to the Consolidated Complaint, Defendants have denied all allegations of wrongdoing and insist that they have no liability.

30.     In June 2011, the parties engaged in preliminary discussions concerning the possible resolution of the Action.  In connection with those discussions, Fuqi produced approximately 230,000 pages of documents, many of them in Chinese requiring translation.  In addition, Plaintiffs

conducted two interviews, one of an outside attorney retained by Fuqi's Audit Committee to investigate the cash transfer issues, and the other was of a member of Fuqi's board of directors, who served on the Audit Committee. Thereafter, the parties agreed to mediate and had a session scheduled for December 2011, but prior to it occurring, it was canceled by Defendants. After several months, Fuqi replaced its counsel.

**The Parties Engage in Mediation and Subsequent Negotiations**

31.     At a time when Plaintiffs were about to attempt to commence formal discovery, the parties began again to discuss the prospect of resolving the Action and agreed to participate in a formal mediation that was held on December 12, 2013 in Newport Beach, California, before the Hon. Layn Phillips. In advance of the mediation, each side submitted comprehensive mediation statements setting forth the strengths and weaknesses of their case. Plaintiffs also submitted a Reply Memorandum responding to Defendants' Mediation Statement. The parties, along with Defendants' insurance carriers, met face-to-face, and with Judge Phillips presiding over the session, debated the various issues in the litigation, including liability, damages and loss causation. The parties' positions on the issues were repeatedly challenged by the opposing side during that session and afterwards. Judge Phillips then met separately with the litigants, and he challenged the parties separately to justify their positions.

32.     The negotiations went back-and-forth for the full day and into the evening, with the parties advocating their positions and the strengths and weaknesses of their respective cases being thoroughly debated, including Plaintiffs' ability to collect any judgment and the Plaintiffs' damages analysis. Lead Counsel zealously advanced the Class' positions and was fully prepared to continue to litigate rather than accept a settlement that was not in the best interests of the Class. The parties, with the assistance of Judge Phillips, exchanged counter-proposals throughout the day until Judge Phillips suggested a range between which the parties might be able to reach agreement. The parties

each separately accepted the range suggested by Judge Phillips and subsequently reached agreement at $7.5 million.  As a result of the extensive negotiations and the mediation session with the assistance of Judge Phillips, there can be no question that the Settlement was the result of hard fought arm's-length negotiations.

33.    Consistent with the parties' hard-fought and aggressive litigation of this Action, there were no productive settlement discussions until Lead Counsel had spent many hours investigating the allegations in this Action, reviewing scores of pages of documents, consulting with accounting experts, directing an investigation in China whereby more than 30 individuals who had connections to Fuqi were interviewed, interviewing a Fuqi Board member who served on the Audit Committee, interviewing the attorney who conducted the investigation into the cash transfers authorized by Fuqi's CEO and had begun preparing for additional formal discovery, as well as researching and considering damages issues and loss causation, and the prospects of enforcing a judgment in China. Once settlement discussions commenced, it took many months to reach an agreement-in-principle with the Defendants.   Indeed, once Plaintiffs reached agreement with Defendants, it took approximately eight (8) additional months to agree upon all the details of the Settlement as reflected in the Stipulation.  Lead Counsel and counsel for Defendants debated numerous issues back-and-forth as to what was needed by each side in the various settlement documents.  Drafts of each of the documents were exchanged repeatedly during those months, and disputed issues arose that needed to be resolved.  On several occasions, it appeared that the parties were at a standstill and would be unable to resolve certain disagreements as to the wording of the settlement documents.  Only through the persistence of Lead Counsel and counsel for Defendants was an agreement produced that all sides could sign.

34.     The $7.5 million cash Settlement Fund has been paid into an interest-bearing escrow account for the benefit of the Class.  This Settlement consideration and interest, after the deduction of attorneys' fees and expenses awarded by the Court, notice and administration expenses, and taxes and related expenses (the "Net Settlement Fund"), will be distributed among all Class Members who submit timely and valid Proofs of Claim ("Authorized Claimants"), in accordance with the Plan of Allocation described in the Notice.  Lead Counsel firmly believe that the compromise embodied in the Settlement represents an excellent recovery for the Class.  The proposed $7,500,000 will provide Class Members a benefit now and without risk of no recovery sometime in the future if the litigation continued.

## III.     MAILING AND PUBLICATION OF NOTICE OF SETTLEMENT

35.     On November 7, 2014, Plaintiffs filed an unopposed motion for preliminary approval of Settlement.  This Court entered the Preliminarily Approval Order on November 21, 2014 (Docket Entry 24), preliminarily certifying the Class.   The Court also approved the form and content of the Notice, Proof of Claim and Summary Notice.  In the Preliminarily Approval Order, the Court set a schedule for mailing the Notice (which included the Proof of Claim and Release ("Proof of Claim")) to Class Members who could be identified with reasonable effort, and for publishing the Summary Notice in Investor's Business Daily, and for a press release announcing the Settlement to be disseminated.

36.     The Notice provided details about the Settlement and the litigation, and informed members of the Class that Lead Counsel will ask the Court for attorneys' fees not to exceed one-third of the Settlement Fund and expenses not to exceed $300,000 to be paid from the Settlement Fund.  In addition, the Notice also advised that the Lead Plaintiff members, who incurred expenses and devoted substantial effort directly related to the representation of the Class, will seek reimbursement.  Specifically, the Notice stated that Puerto Rico Government Employees and

- 15 -

Judiciary Retirement Systems Administration will seek an amount not to exceed $10,000, and Craig B. Laub, J.D. Pisut, and Sandra Redfern will seek amounts not to exceed $5,000 each. Angeion, the Claims Administrator, did an initial mailing of the Settlement Notice to Class members or representatives in December 2014 and had the Summary Notice published in January 2015. Exhibit 1 hereto (Walsh Decl.), at ¶¶13-14. The Notice informed Class members that any objections to the Settlement, the plan of allocation, the request for attorneys' fees, reimbursement of expenses or Lead Plaintiff awards needed to be filed by January 29, 2015. Angeion has received communications and claims from Class members and has provided updated information regarding objections, requests for exclusion, claims forms submitted to the Claims Administrator, and other information relevant to the request for final approval. Exhibit 9 hereto (Ferrara Decl.), at ¶¶9, 10, 12.

37.   The facts contained within the Ferrara Decl. reflecting the reaction of the Class to the Settlement support Lead Counsel's conclusion that they obtained an outstanding result for the Class.

## IV.   FACTORS TO BE CONSIDERED IN SUPPORT OF SETTLEMENT

### A.   The Settlement Was Fairly and Aggressively Negotiated by Counsel

38.   As set forth above, the terms of the Settlement were negotiated by the Parties at arm's-length. The Settlement was reached only after extensive protracted settlement negotiations with the substantial assistance of Judge Phillips. Consistent with the Parties' hard-fought and aggressive litigation of this Action, Lead Counsel spent many hours investigating the allegations of wrongdoing and assessing Plaintiffs' claims, while at the same time pursuing settlement discussions. Once settlement discussions commenced, it took months for Lead Counsel to reach agreement, document and present the final terms of the Settlement to the Court for approval.

39.   The volume and substance of Lead Counsel's knowledge of the merits and potential weaknesses of Lead Plaintiffs' claims are unquestionably adequate to support the Settlement. This knowledge is based, first and foremost, on Lead Counsel's extensive investigation and discovery

during the prosecution of this Action, including, *inter alia*: (i) review of more than 230,000 pages of documents produced by Fuqi; (ii) review of Fuqi's press releases, public statements, SEC filings, regulatory filings and reports, and securities analysts' reports and advisories about the Company; (iii) review of media reports about the Company; (iv) implementing and directing a fact-gathering plan, including retention of investigators who interviewed numerous people in China who were involved with various aspects of Fuqi's operations, including former employees; (v) consultation with an accounting expert; (vi) consultation with a damages expert; (vii) interviews with a Fuqi board member who served on the Audit Committee during the time applicable to this Action, and with the attorney who performed the investigation into the CEO's allegedly improper cash transfers; and (viii) research of the applicable law with respect to the claims asserted in the Action and the potential defenses thereto, including the collectability of a judgment in China and the enforcement of a U.S. judgment by Chinese courts.  This information permitted Lead Counsel to be well-informed about the strengths and weaknesses of their case and to engage in an effective mediation.

**B.    Serious Questions of Law and Fact Placed the Outcome of the Class Action in Significant Doubt**

40.    Another factor considered in assessing the merits of class action settlements - whether serious questions of law and fact exist – supports the conclusion that the Settlement is fair, reasonable and adequate to the Class.

41.    Throughout the course of the litigation, Defendants asserted that they possessed defenses to Plaintiffs' claims, including, but not limited to, Plaintiffs' failure to plead material misstatements or omissions, loss causation, and that Plaintiffs' damages were dramatically lower than Plaintiffs suggested, if they existed at all.  Moreover, Defendants insisted that even if Plaintiffs were able to prevail on some of their claims, they would never be able to enforce a judgment in the Chinese courts, which would not be resolved for years, and that Plaintiffs ultimately would not be

able to collect on any judgment.  If the case continued, Defendants would have first moved to dismiss and then, if necessary, moved for summary judgment to either succeed in defeating the claims completely or significantly limiting the scope of the Class' potential damages.  Thus, the Settlement is unquestionably better than another distinct possibility – no recovery for the Class.

> **1.      Defendants Would Argue that Plaintiffs Could Not Prevail on Their Claims**

42.      Without this Settlement, Defendants would have continued to argue that Plaintiffs could not prevail on their claims.  Defendants would have claimed that the decline in Fuqi's stock price was not related to any materially false or misleading statements in the Registration Statement/Prospectus, and that their actions were contrary to any claim that they had the intent to defraud or mislead anyone.  They would have contended that they made all necessary disclosures in the Company's SEC filings about its internal controls and that any financial information in the Registration Statement/Prospectus that required restating was only applicable to the first quarter of 2009 and not material and/or did not result in any recoverable loss under the securities laws.

43.      Moreover, Defendants would have claimed that in addition to disclosing its internal control problems, they also were diligently working to correct any such issues.  Defendants would have referred to numerous documents which showed that Fuqi executives and board members discussed financial issues and attempted to correct them before they became material problems. Thus, Defendants would have contended that scienter did not exist and that Plaintiffs would not have succeeded on the Exchange Act claims, which comprised the bulk of the alleged damages.  Indeed, Defendants pointed to the settlement Fuqi and Chong entered into with the SEC as support for their claim that scienter did not exist.

44.      As to the cash transfer issue, Defendants would have claimed that these were actions in which the CEO was seeking to improve the Company's relationship with its banks and that

because all funds that were transferred were returned by the end of the fiscal quarter, the Company did not file any incorrect statements in connection with those transfers.  Moreover, as stated below, Defendants would have claimed that by the time the cash transfers were disclosed to the public, Fuqi's stock price was already trading at a low level and any damages attributable to the cash transfer issue were minimal.

45.     While Plaintiffs had some evidence to counter Defendants' arguments, Plaintiffs would have been hard-pressed to establish scienter on the restatement issues, and may not have been able to defeat any summary judgment motion on that issue, even if they defeated a motion to dismiss.  In any event, any summary judgment motion would have been hard-fought and extensive, and Plaintiffs would have no guarantee of success.  Even if such motions were denied, Lead Counsel recognize that a finding of liability by a jury is never assured, and that Defendants would renew these arguments at trial.

46.     Even more concerning to Plaintiffs was that they might not have been able to enforce any judgment in China and would be unable to collect on any judgment.  Defendants repeatedly claimed that no Chinese court has enforced a U.S. judgment and that they were confident the Company and the Chinese-based defendants would not have to satisfy any judgment in this case.  Given that all of Fuqi's assets were in China, Plaintiffs options were limited.  While a few of the individual defendants were in the U.S., they did not appear to have significant assets.  The Underwriters were in the U.S., but they had defenses that would have been difficult to overcome, including that they performed due diligence and acted in good faith in connection with the Secondary Offering and were unable to detect the need for a restatement of the first quarter of 2009 financials.  Although Plaintiffs had counter-arguments, there were no documents or other evidence indicating that liability against the Underwriters would be readily established.  Indeed, most of the

documents showed the contrary, *i.e.*, that any accounting problems involved immaterial amounts and/or were being adequately addressed by the Company.

> ## 2. Defendants Would Argue that Plaintiffs Could Not Establish Loss Causation or Significant Damages

47.     According to Defendants, Plaintiffs cannot and would not be able to prove loss causation or damages because there were no disclosures made that led to a significant stock price decline. *See Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005).  Instead, the Defendants would contend that they had already disclosed the risks that resulted in the need for restatements and that the stock price decrease was instead caused by other information, such as Fuqi's earnings announcement, which they contend was regarded as bad news by the market.  Moreover, Defendants would contend that if loss causation did not eliminate damages, it severely limited them.

48.     The risks of establishing liability posed by conflicting testimony and evidence would be exacerbated by risks inherent in all shareholder litigation, including the unpredictability of a lengthy and complex jury trial, the risk that the jury would react to evidence in unforeseen ways, the risk that a jury would find that some or all of the alleged misrepresentations were not material and the risk that the jury would find that the Defendants reasonably believed in the appropriateness of their actions at the time and that no damages were caused by their actions.

49.     Among other things, this case also involved a number of complex issues including Fuqi's purchase of retail facilities and the impact of those facilities on its accounting, the interaction between accounting standards and financial statement filings in the U.S. as opposed to China, and the interpretation of intentions by the corporate defendant.  Assuming Plaintiffs survived Defendants' anticipated motions to dismiss and for summary judgment, presenting these complex issues to a jury would pose a particular risk to Plaintiffs' hopes for success at trial.  Plaintiffs could not be certain that the jury would be able to understand these matters well enough to reach a factual

determination in Plaintiffs' favor.  Thus, Plaintiffs faced the risk that Defendants' arguments may find favor with a jury and result in the Class losing at trial.

50.     Plaintiffs also faced the risk that they would not be able to prove damages even if liability was established.  Defendants would argue that the decline in stock price and the resulting losses incurred by shareholders were due primarily to the unexpected announcement by Fuqi as to its results and other news rather than any alleged misstatements in the Prospectus/Registration Statement or other SEC filings.  Defendants would also have argued that even if Plaintiffs were able to establish their liability, damages were much lower than Plaintiffs estimated because, among other things, the Company's stock price had increased to prices higher than the Secondary Offering price and therefore many investors sold their shares.  Given the problems with tracing of shares, Defendants would have argued that any Securities Act damages were significantly limited.  As to Exchange Act damages, in addition to the loss causation argument in connection with the restatement announcement, Defendants would have contended that the cash transfer claim provided little or no damages.  By the time of the cash transfer disclosure, Fuqi's shares were already trading at a low price.  Defendants would have argued that the disclosure of the cash transfer did not reduce the price of Fuqi stock by a material amount, but even if it did, the damages were *de minimus*.

51.     The determination of damages, like the determination of liability, is a complicated and uncertain process, typically involving conflicting expert opinions.  Moreover, the reaction of a jury to such complex expert testimony is highly unpredictable.  Expert testimony about damages could rest on many subjective assumptions, any one of which could be rejected by a jury as speculative or unreliable.  Conceivably, a jury could find that there were no damages or that damages were only a fraction of the amount that Plaintiffs sought.

52.     Although Lead Counsel believe that they would be able to provide convincing expert testimony as to damages, and establish damages, we also realize that in the "battle of the experts," a jury might disagree with Plaintiffs' experts. Accordingly, the risk of proving damages could not be eliminated until after a successful trial and the exhaustion of all appeals. Thus, even if Plaintiffs prevailed in establishing liability, additional risks would remain in establishing both loss causation and the existence or amount of damages.

### C.     The Judgment of the Parties that the Settlement Is Fair and Reasonable Provides Additional Support for Approval of the Settlement

53.     Another factor in considering whether to approve class action settlements is the judgment of the parties that the settlement is fair and reasonable. As outlined above, the Settlement is the product of arm's-length negotiations lasting over many months between adversaries with significant experience in securities class action litigation.

54.     Lead Counsel strongly believe that the Settlement represents an excellent resolution for the Class under the circumstances. As outlined above, the Settlement is fair, reasonable and adequate in all respects and should be approved by the Court.

55.     Lead Counsel also strongly believe that the information provided by the Claims Administrator, reflecting the reaction of the Class, supports Lead Counsel's conclusion that the Class is overwhelmingly satisfied with the result achieved through this Settlement. *See* Ferrara Decl., at ¶¶9-10.

## V.     THE PLAN OF ALLOCATION

56.     Pursuant to the Preliminary Approval Order and as set forth in the Notice, all Class Members who wish to participate in the distribution of the Settlement Fund must submit a proper Proof of Claim form. As provided in the Stipulation, after deducing all appropriate taxes,

administrative costs, attorneys' fees and expenses, the Net Settlement Fund shall be distributed to Authorized Claimants.

57.     The Settlement Fund will be distributed in accordance with the proposed Plan of Allocation. To the extent there are sufficient funds in the Net Settlement Fund, each Authorized Claimant will receive an amount equal to the Authorized Claimant's claim. If, however, the amount in the Net Settlement Fund is not sufficient to permit payment of the total claim of each Authorized Claimant, then each Authorized Claimant shall be paid the percentage of the Net Settlement Fund that each Authorized Claimant's Recognized Loss bears to the total of the Recognized Losses of all Authorized Claimants. Payment in this manner shall be deemed conclusive against all Authorized Claimants. The objective of the Plan of Allocation is to equitably distribute the net proceeds of the Settlement Fund to those Class Members who suffered losses as a result of the alleged violations of the federal securities laws, as opposed to losses caused by factors unrelated to the alleged violations of law. The proposed Plan of Allocation was prepared in consultation with Plaintiffs' financial experts, who were familiar with the factual and legal issues in the Action. There have been no objections filed to the Plan of Allocation.

58.     The Plan of Allocation reflects the allegations in the Complaint that Defendants made materially untrue and misleading statements and omissions resulting in violations of the Exchange Act and the Securities Act, and opinions of Plaintiffs' experts on the damages that were caused by the alleged disclosures and omissions of Defendants. The Plan of Allocation is based on Plaintiffs' damage theory as well as U.S. Supreme Court decisions that limit recovery for certain purchases and sales during the Class Period and the PSLRA, which prescribes certain limitations on recoveries.

59.     The Plan of Allocation is consistent with Plaintiffs' allegations and Plaintiffs' expert's findings that investors who purchased shares of Fuqi stock during the Class Period or on the

Secondary Offering were damaged by Defendants' false and misleading statements. An Authorized Claimant's Recognized Loss will be based upon the dates of purchase and sale, if any, in correspondence with the decline in the stock price of Fuqi that was found to be reasonably attributable to the misstatements alleged in the Amended Complaint. The Recognized Loss formula is not intended to be an estimate of the amount that will be paid to Authorized Claimants pursuant to the Settlement. The Recognized Loss formula is simply the basis upon which the Net Settlement Fund will be proportionately allocated to Authorized Claimants.

60. Lead Counsel respectfully submit that the Plan of Allocation is fair, reasonable and adequate, and should be approved by the Court.

## VI.   FACTORS TO BE CONSIDERED IN SUPPORT OF THE REQUESTED ATTORNEYS' FEE AWARD

61. Despite working on this matter for more than five years, Plaintiffs' Counsel have not received any payment for their services in prosecuting this Action, nor have they been reimbursed for their out-of-pocket expenses incurred in the prosecution of the Action. The Notice provides that Lead Plaintiffs' counsel may apply for an award of attorneys' fees equal to one-third of the proceeds of the Settlement, plus expenses of up to $300,000, which were incurred in the Action, plus interest thereon. As set forth in Lead Plaintiff's Memorandum of Law in Support of Amended Motion For Attorneys' Fees, Reimbursement of Expenses and Lead Plaintiff Awards, Lead Counsel are requesting attorneys' fees of one-third of the proceeds from the Settlement, plus expenses of $252,602.58, plus interest earned thereon at the same rate that was earned on the Settlement Fund. The requested fee award of one-third is well within the range of fees awarded by Courts in this District and in courts throughout the country, particularly in light of the time expended on this Action (i.e., a lodestar of $3,156,698.75).

62.     Lead Counsel achieved this excellent result for the Class at great risk and substantial expense to themselves.  We were unwavering in our dedication to the interests of the Class and our investment of the time and resources necessary to bring this litigation to a successful conclusion as against the Defendants.  Lead Counsel's compensation for the services rendered has always been wholly contingent.  The requested fee is reasonable based on the quality of Lead Counsel's work and the substantial benefit obtained for Class.

63.     Indeed, the results obtained by Lead Counsel for the Class are truly extraordinary given the obstacles that existed to obtaining any recovery.  Defendants have maintained throughout this litigation that they had no liability, that damages were minimal and that even if a judgment were obtained, Plaintiffs would be unable to enforce it and collect on it.  They insisted that any losses attributable to the Secondary Offering documents were minimal, if they existed at all, and that they did not engage in any intentional actions that were actionable under the securities laws.  Had the case proceeded, they would have moved to dismiss, and if any claims went forward, they would have moved for summary judgment, on which Defendants insisted they would prevail.

64.     In addition, Defendants maintained that loss causation did not exist.  They claimed that any decline in the Company's stock price was not related to any misstatements or omissions that they made, but was caused by their announcement of other negative news.  As such, Defendants contended that Plaintiffs would not be able to prove loss causation and would not be able to obtain a recovery.  Defendants further claimed that even if some amount of the decline in the Company's price could be attributable to their actions, those damages would be small and any recovery by Plaintiffs would be much lower than the amounts being sought.

65.     Lead Counsel's compensation for the services rendered was wholly contingent on their success.  Demonstrating Lead Counsel's tremendous commitment to this litigation, we have

devoted more than 6,579 hours litigating this Action.  The expenses incurred in the prosecution of the litigation are set forth in the accompanying declarations from Lead Counsel and the other Plaintiffs' Counsel, who contributed to the successful prosecution of the litigation.  Exhibits 2, 3 and 4 hereto.  Each firm requesting reimbursement of expenses has declared that the expenses are reflected in the books and records maintained by the firm, and are an accurate recordation of the expenses incurred.  In total, Plaintiffs' Counsel have incurred reimbursable expenses in the amount of $252,602.58.  These costs and expenses have been reasonably incurred and should be approved by the Court.

### A.      Extent of Litigation

66.      As described above, this case was thoroughly investigated and litigated and settled only after extensive settlement negotiations, including a full day mediation session, lasting into the evening hours, before Judge Phillips.  Lead Counsel reviewed more than 230,000 pages of documents, many of which were in Chinese, including thousands of e-mails, implemented and directed an investigation conducted by investigators in China, thoroughly researched the law applicable to the Class' claims and Defendants' defenses, including enforcement and prosecution of claims in China, prepared and filed a fact specific consolidated complaint and an amended complaint specifying Defendants' alleged violations of the federal securities laws, worked with investigators who interviewed people familiar with Fuqi's operations, including former employees, consulted with accounting and damages experts, participated in a mediation session with Defendants, overseen by Judge Phillips, and engaged in extensive settlement negotiations over many months with the Defendants, even after an agreement-in-principle was agreed upon.  In total, the 6,579.15 hours thus far devoted by Plaintiffs' Counsel in the prosecution of this case represents a total lodestar of $3,156,698.75.  *See* Exhibit 2 hereto (Twersky Decl.) at ¶7; Exhibit 3 hereto (MacFall Decl.) at ¶7; Exhibit 4 hereto (Sams Decl.) at ¶7.  Plaintiffs' Counsel's work in this case, however, did not cease

after preliminary approval of the Settlement and submission of the papers in support of final approval of the Settlement, and will not cease even after final approval of the Settlement.  Lead Counsel has spent significant time assisting Class Members with claims administration issues and will continue to work with the Claims Administrator to ensure a prompt distribution of the Net Settlement Fund to the Class.

> **B.     Standing and Expertise of Plaintiffs' Counsel**

67.     Plaintiffs' Counsel are among the most experienced and skilled practitioners in the securities litigation field.  The attorneys at each of Plaintiffs' Counsel's firms have years of experience litigating securities class actions, and have been involved in cases that have recovered hundreds of millions of dollars for shareholders.  *See* Exhibit A attached to Exhibit 2; Exhibit A attached to Exhibit 3; Exhibit A attached to Exhibit 4.

> **C.     Standing and Caliber of Opposition Counsel**

68.     Defendants are represented by outstanding law firms.  Defendants' law firms vigorously defended their clients, insisted they had no liability and gave every indication they were ready to proceed with the litigation, including to trial if necessary, if a settlement was not reached. In the face of this opposition, Plaintiffs' Counsel developed arguments so as to persuade Defendants to settle the case on a basis favorable to the Class under the circumstances.

> **D.     The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk, Contingent Securities Cases**

69.     This litigation was undertaken by Plaintiffs' Counsel on a wholly-contingent basis. From the outset, Plaintiffs' Counsel understood that they were embarking on a complex, expensive and lengthy litigation with no guarantee of ever being compensated for the enormous investment of time and money the case would require.  In undertaking that responsibility, Plaintiffs' Counsel were obligated to assure that sufficient resources were dedicated to the prosecution of this litigation and

that funds were available to compensate staff and the considerable out-of-pocket costs which a case such as this entails.

70.     Because of the nature of a contingent practice in the area of securities litigation, where cases are predominantly "big cases" lasting several years, not only do contingent litigation firms have to pay regular overhead, but they also have to advance the expenses of the litigation. With an average lag time of three to four years for these cases to conclude, the financial burden on contingent counsel is far greater than on a firm that is paid on an ongoing basis.

71.     The foregoing does not even take into consideration the possibility of no recovery. As discussed above, from the outset, this litigation presented a number of unique risks and uncertainties which could have prevented any recovery whatsoever.  It is wrong to assume that a law firm handling complex contingent litigation such as this always wins.  Tens of thousands of hours have been expanded in losing efforts.  The factor labeled by the courts as "the risks of litigation" is not an empty phrase.

72.     There are numerous cases where Plaintiffs' counsel in contingent cases, after the expenditure of thousands of hours, have received no compensation.  It is only the knowledge by Defendants and their counsel that the leading members of the Plaintiffs' securities bar are actually prepared to, and will, force a resolution on the merits and go to trial, that permits meaningful settlements in actions such as this.

73.     There have been many hard fought lawsuits where, because of the discovery of facts unknown when the case was commenced, or changes in the law during the pendency of the case, or a decision of a judge following a trial on the merits, excellent professional efforts of members of the plaintiffs' bar produced no fee for counsel.

74.     For example, although a motion to dismiss had not yet been filed by Defendants in this Action, there has been a recent trend toward dismissal of actions with prejudice at the pleading stage.  Indeed, many recent federal appellate reports are filled with opinions affirming dismissals with prejudice in securities cases.  *See, e.g., Dalberth v. Xerox Corp.,* 766 F.3d 172 (2d Cir. 2014); *City of Pontiac Policemen's and Fireman's Ret. Sys. v. UBS AG,* 752 F.3d 173 (2d Cir. 2014); *Kleinman v. Elan Corp., Plc,* 706 F.3d 145 (2d Cir. 2013); *ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.,* 553 F.3d 187 (2d Cir. 2009); *Rubke v. Capitol Bancorp Ltd.,* 551 F.3d 1156 (9th Cir. 2009); *Stark Trading v. Falconbridge Limited,* 552 F.3d 568 (7th Cir. 2009); *Public Employees' Retirement Association of Colorado v. Deloitte & Touche LLP,* 551 F.3d 305 (4th Cir. 2009); *Zucco Partners, LLC v. Digimarc Corp.,* 552 F.3d 981 (9th Cir. 2009); *Mizzaro v. Home Depot, Inc.,* 544 F.3d 1230 (11th Cir. 2008); *Employers Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.,* 353 F.3d 1125 (9th Cir. 2004); *In re Read-Rite Corp. Sec. Litig.,* 335 F.3d 843 (9th Cir. 2003); *In re Silicon Graphics Sec. Litig.,* 183 F.3d 970 (9th Cir. 1999); *Schiller v. Physicians Res. Group, Inc.,* 342 F.3d 563 (5th Cir. 2003); *Gompper v. VISX, Inc.,* 296 F.3d 893 (9th Cir. 2002); *Wilkes v. Versant Object Tech. Corp.,* 56 Fed. Appx. 322 (9th Cir. 2003); *Zishka v. Am. Pad & Paper Co.,* 72 Fed. Appx. 130 (5th Cir. 2003); *Romine v. Acxiom Corp.,* 296 F.3d 701 (8th Cir. 2002); *Seinfeld v. Bartz,* 322 F.3d 693 (9th Cir. 2003); *Abrams v. Baker Hughes, Inc.,* 292 F.3d 424 (5th Cir. 2002); *ABC Arbitrage v. Tchuruk,* 291 F.3d 336 (5th Cir. 2002); *DSAM Global Value Fund v. Altris Software, Inc.,* 288 F.3d 385 (9th Cir. 2002); *Lipton v. PathoGenesis Corp.,* 284 F.3d 1027 (9th Cir. 2002); *In re Vantive Corp. Sec. Litig.,* 283 F.3d 1079 (9th Cir. 2002); *Ronconi v. Larkin,* 253 F.3d 423 (9th Cir. 2001); *Phila v. Fleming Cos.,* 264 F.3d 1245 (10th Cir. 2001); *Kalnit v. Eichler,* 264 F.3d 131 (2d Cir. 2001); *Oran v. Stafford,* 226 F.3d 275 (3d Cir. 2000); *Yourish v. Cal. Amplifier,* 191 F.3d 983 (9th Cir. 1999); *In re Advanta Corp. Sec. Litig.,* 180 F.3d

525 (3d Cir. 1999); *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609 (4th Cir. 1999); *In re Comshare, Inc.*

*Sec. Litig.*, 183 F.3d 542 (6th Cir. 1999); *Suna v. Bailey Corp.*, 107 F.3d 64 (1st Cir. 1997); *Chill v.*

*GE*, 101 F.3d 263 (2nd Cir. 1996); *In re Syntex Corp. Sec. Litig.*, 95 F.3d 922 (9th Cir. 1996); *Gross*

*v. Summa Four*, 93 F.3d 987 (1st Cir. 1996); *Glassman v. Computervision Corp.*, 90 F.3d 617 (1st

Cir. 1996); *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399 (9th Cir. 1996); *Epstein v. Wash. Energy Co.*,

83 F.3d 1136 (9th Cir. 1996); *Lovelace v. Software Spectrum*, 78 F.3d 1015 (5th Cir. 1996); *San*

*Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801 (2d Cir.

1996); *Acito v. IMCERA Group*, 47 F.3d 47 (2d Cir. 1995).

75.     The many appellate decisions affirming summary judgments and directed verdicts for

defendants show that even surviving a motion to dismiss is no guarantee of recovery.  *See Hubbard*

*v. BankAtlantic Bancorp, Inc.,* 688 F.3d 713 (11th Cir. 2012); *In re Williams Sec. Litig. – WCG*

*Subclass*, No. 07-5119, 2009 U.S. App. LEXIS 3032 (10th Cir. Feb. 18, 2009); *Shuster v.*

*Symmetricom, Inc.*, 35 Fed. Appx. 705 (9th Cir. 2002); *Gross v. Nuveen Advisory Corp.*, 295 F.3d

738 (7th Cir. 2002); *In re Digi Int'l, Inc. Sec Litig.*, 14 Fed. Appx. 714 (8th Cir. 2001); *Geffon v.*

*Micrion Corp.*, 249 F.3d 29 (1st Cir. 2001); *Oran v. Stafford*, 226 F.3d 275 (3d Cir. 2000); *Greebel*

*v. FTP Software, Inc.*, 194 F.3d 185 (1st Cir. 1999); *Longman v. Food Lion, Inc.*, 197 F.3d 675 (4th

Cir. 1999); *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609 (4th Cir. 1999); *In re Comshare, Inc. Sec. Litig.*,

183 F.3d 542 (6th Cir. 1999); *Levitin v. PaineWebber, Inc.*, 159 F.3d 698 (2d Cir. 1998); *Silver v.*

*H&R Block*, 105 F.3d 394 (8th Cir. 1997).  Moreover, even plaintiffs who succeed at trial may find

their judgment overturned on appeal.  *See, e.g., Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th

Cir. 1996) (overturning plaintiffs' verdict obtained after two decades of litigation); *Backman v.*

*Polaroid Corp.*, 910 F.2d 10 (1st Cir. 1990) (*en banc*) (reversing plaintiffs' verdict for securities

fraud and ordering entry of judgment for defendants); *Ward v. Succession of Freeman*, 854 F.2d 780

(5th Cir. 1988) (reversing plaintiffs' jury verdict for securities fraud); *Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) (same).

76.     The foregoing refutes the argument that the commencement of a class action is a guarantee of a settlement and payment of a fee.  Indeed, the course of this litigation demonstrates the fact that the mere filing of an action does not ensure that there will be any settlement or fee.  There was a demonstrable risk that the Class and its counsel would receive nothing.  It took hard and diligent work by skilled counsel, to develop facts and theories which persuaded the Defendants to enter into serious settlement negotiations.  If defendants believe they will prevail, experience shows that they will litigate to the end.  The risk factor is real.

77.     Losses such as those described above are exceedingly expensive.  The fees that are awarded are used to cover enormous overhead expenses incurred during the course of the litigation and are taxed by federal, state and local authorities.  Moreover, changes in the law through legislation or judicial decree can be catastrophic, frequently affecting contingent counsel's entire inventory of pending cases.  These are real threats.

78.     Courts have repeatedly held that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies.  Vigorous private enforcement of the securities and corporation laws can only occur if the private plaintiffs can obtain parity in representation with that available to large institutional interests.  If this important public policy is to be carried out, the courts should award fees which will adequately compensate private plaintiffs' counsel, taking into account the risks undertaken with a clear view of the economies of a securities class action.

79.     When we undertook to act for the Plaintiffs in this matter, it was with the knowledge that we would spend many hours of hard work against some of the best defense lawyers in the

United States with no assurance of ever obtaining any compensation for our efforts.  The benefits conferred on the Class by this Settlement are particularly noteworthy in that a Settlement Fund worth more than $7.5 million was obtained for the Class despite the existence of substantial risks of no recovery in light of the vigorous arguments asserted by Defendants and the defense they mounted and would mount, and the difficulties of enforcing and collecting on any judgment.

> ### E.   Lead Counsels' Request for Payment of Expenses Incurred Is Reasonable and Should Be Approved

80.     Lead Counsel and additional Plaintiffs' Counsel have submitted declarations setting forth the amounts of the expenses incurred over the course of the litigation.  These declarations are filed herewith.  *See* Exhibit 2 (Twersky Declaration) at ¶7 & Exhibit B thereto; Exhibit 3 (MacFall Declaration) at ¶8 & Exhibit B thereto; Exhibit 4 (Sams Declaration) at ¶8 & Exhibit B thereto. These expenses were necessarily incurred for the successful prosecution of this litigation and are reasonable in amount.

> ### F.   The Requested Reimbursement Awards Are Fair and Reasonable

81.     The members of Lead Plaintiff PR Group seek reimbursement awards for their lost time and efforts in prosecution and oversight of the Action on behalf of the Class.  The requested amounts of $10,000 for Puerto Rico Government Employees and Judiciary Retirement Systems Administration and $5,000 each for Craig B. Laub, J.D. Pisut, and Sandra Redfern are reasonable and well within the range of awards typically granted by courts in this Circuit.  The Lead Plaintiff members have each submitted detailed declarations setting forth their participation in the Action. *See* Exhibits 5-8 attached hereto.

82.     As those Declarations state:  Each of the members of the PR Group was provided with and reviewed the pleadings and filings in the Action, and discussed with Plaintiffs' Counsel the filings, case strategies, and settlement.  *See id.*  Each of the Lead Plaintiffs had telephone

conferences and email exchanges with Plaintiffs' Counsel in connection with their respective oversight and prosecution of the Action, including settlement negotiations. *Id.* When settlement negotiations commenced, the PR Group members had discussions with Lead Counsel regarding a possible settlement of the Action; and they communicated with Lead Counsel about the mediation session held on December 12, 2013, and afterwards as settlement negotiations continued and an agreement was finalized.

83.     In the opinion of Plaintiffs' Counsel, the PR Group's members' active participation and efforts expended in prosecuting the Action have materially aided the favorable Settlement achieved for the Class in the Action.

84.     The amount requested is reasonable in light of the each of the Lead Plaintiffs' substantial contributions to the Action and the Class. The reasonableness of the requested awards is further evidenced by the fact that not a single Class Member has objected to the awards, even though the Notice advised that such awards would be sought.

## VII.   CONCLUSION

85.     For the reasons set forth above and in the accompanying Lead Plaintiff's Memorandum of Law in Support of Amended Motion For Final Approval of Settlement and the Proposed Plan of Allocation and Lead Plaintiff's Memorandum of Law in Support of Amended Motion for Attorneys' Fees, Reimbursement of Expenses and Lead Plaintiff Awards, I respectfully submit that: (a) the Settlement is fair, reasonable and adequate and should be finally approved; (b) the Plan of Allocation represents a fair method for the distribution of the Net Settlement Fund among Class Members and should also be approved; and (c) the application for attorneys' fees of one-third of the proceeds of the Settlement, plus expenses in the amount of $252,602.58, plus interest earned on both amounts, should be granted and that Lead Plaintiff awards in the amount of $10,000 to

Puerto Rico Government Employees and Judiciary Retirement Systems Administration and $5,000 each to Craig B. Laub, J.D. Pisut, and Sandra Redfern should be approved.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of our knowledge, information and belief.

Executed on August 31, 2015.

_____
LAWRENCE D. LEVIT